**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

STATE OF NEW YORK
28 Liberty Street
New York, NY 10005;

STATE OF NEW JERSEY
25 Market Street
Trenton, NJ 08625;

STATE OF CONNECTICUT
165 Capitol Avenue
Hartford, CT 06106;

STATE OF DELAWARE
Carvel State Office Building, 5th Floor
820 North French Street
Wilmington, DE 19801;

STATE OF MAINE
6 State House Station
Augusta, ME 04330;

COMMONWEALTH OF MASSACHUSETTS
1 Ashburton Place
Boston, MA 02108;

STATE OF RHODE ISLAND
150 South Maine Street
Providence, RI 02903; and

STATE OF VERMONT
109 State Street
Montpelier, VT 05609,

Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, NW
Washington, DC 20240;

C.A. No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

DOUGLAS J. BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240;

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street, NW
Washington, DC 20240;

MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management
1849 C Street, NW
Washington, DC 20240;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530;

TODD BLANCHE, in his official capacity as Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530;

STANLEY WOODWARD, in his official capacity as Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530;

INVENERGY WIND OFFSHORE LLC, as an interested party
1 S. Wacker Drive, Suite 1500
Chicago, IL 60606; and

INVENERGY NE OFFSHORE WIND LLC, as an interested party
1 S. Wacker Drive, Suite 1500
Chicago, IL 60606,

Defendants.

Plaintiffs the State of New York, the State of New Jersey, the State of Connecticut, the State of Delaware, the State of Maine, the Commonwealth of Massachusetts, the State of Rhode Island, and the State of Vermont (together, the States), as and for their complaint, allege as follows, upon information and belief, against defendants the U.S. Department of the Interior (Interior); Douglas Burgum, Secretary of the Interior (the Interior Secretary), in his official capacity; the Bureau of Ocean Energy Management (BOEM); Matthew Giacona, Acting Director of BOEM, in his official capacity (together with previously listed defendants, Interior Defendants); the U.S. Department of Justice (DOJ); Todd Blanche, Attorney General, in his official capacity; Stanley Woodward, Associate Attorney General, in his official capacity (together with all previously listed defendants, Federal Defendants); and Invenergy Wind Offshore LLC and Invenergy NE Offshore Wind LLC (together, Invenergy), as interested parties:

## INTRODUCTION

1. The Trump Administration has once again misused the Judgment Fund to unlawfully pay an offshore wind developer to abandon its lease and to fund oil and gas development without any congressional appropriation for that purpose.

2. In this lawsuit, the States challenge Federal Defendants' execution and implementation of purported "settlement agreements" (the Settlement Agreements[1]) between the United States and Invenergy that unlawfully cancel offshore wind leases

[1] Even though the Settlement Agreements are not compromise settlement agreements reached by adverse parties, Federal Defendants refer to them as such, so the States will use the term "Settlement Agreements" to avoid confusion.

OCS-A 0542, OCS-A 0562, and OCS-A 0567 (the Leases); pay Invenergy over $653 million from the Judgment Fund; and require Invenergy to spend that money on so-called "conventional energy projects," i.e., oil and gas projects, that the Trump Administration favors.

3. Invenergy won the Leases in auctions in 2022 and 2024, paying $645 million for one lease comprising approximately 84,000 acres in the New York Bight, a shallow area of the Atlantic Ocean between the coasts of New York and New Jersey, and nearly $11 million for two leases comprising approximately 216,000 acres in the Gulf of Maine, including one lease off the coast of Maine and one lease off the coast of Massachusetts.[2]

4. While Federal Defendants invoke nebulous "national security issues" to justify terminating the Leases and misappropriating money from the Judgment Fund, any legitimate national security issues were already accounted for in BOEM's original decision to award the Leases. The Leases were awarded to Invenergy following years of extensive consultation with the Department of Defense (DOD)[3] to ensure that any national security concerns resulting from offshore wind development

[2] Although the combined purchase price of the Gulf of Maine Leases was $10,781,700, pursuant to the terms of the Lease agreements, $2,695,425 of that amount would not be paid to the federal government, but would rather be used for workforce training, domestic supply chain development, and/or fisheries projects. The Settlement Agreements provide only for the reimbursement of the $8,086,275 paid to the federal government.

[3] On September 5, 2025, President Trump issued an executive order seeking to change the name of this federal agency from the Department of Defense to the Department of War. Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sep. 10, 2025). This complaint uses "Department of Defense" or "DOD."

in the Lease areas were appropriately addressed and that any impacts would be appropriately avoided or mitigated.

5. The projects that Invenergy intended to build in the Lease areas were together anticipated to have the capacity to generate around 5.8 gigawatts of electricity, enough to power approximately 2.6 million homes in the States.

6. The Leases were crucial to the States and especially to New York, New Jersey, Maine, and Massachusetts, which have relied on the development of these particular Lease areas as a component of their respective strategies to meet electricity demand and to enhance grid reliability, diversify their energy supply, and achieve their statutory climate and renewable energy goals.

7. The development of these Lease areas also would have benefited Connecticut, Rhode Island, Vermont and Delaware. Connecticut, Rhode Island, and Vermont share an electric grid with Maine and Massachusetts, while Delaware regularly imports energy from New York and New Jersey through high-voltage interconnection to meet rising energy demand. In addition, all these States maintain Renewable Portfolio Standards that require electricity providers to purchase Renewable Energy Certificates/Credits (RECs). Development of the Lease areas could help these States meet rising demand for electricity, satisfy their Renewable Portfolio Standards, and reduce the prices that electricity suppliers in these states pay for RECs.

8. Since the beginning of President Trump's second term, however, the Administration has continually attempted to kill the offshore wind industry.

President Trump has stated that "my goal is to not let any windmill be built,"[4] and Secretary Burgum has promised that "[u]nder this administration, there is not a future for offshore wind."[5]

9. The current Administration has repeatedly broken the law in trying to achieve this objective. For example, in January 2025, President Trump issued a presidential memorandum that purported to impose a categorical and indefinite freeze on all federal permitting for offshore and onshore wind energy. That permitting freeze was found to be unlawful: in December 2025, a federal district court vacated federal agency actions implementing the memorandum after finding that these actions were arbitrary, capricious, and contrary to law, a decision as to which the federal government ultimately did not pursue an appeal.

10. On the heels of that judicial defeat, the Trump Administration tried again to kill offshore wind—this time by issuing suspension orders to projects already under construction. In December 2025, BOEM ordered five offshore wind projects under development on the East Coast to "suspend all ongoing activities related to [projects] on the Outer Continental Shelf for the next 90 days for reasons of national

---

[4] Tamara Keith, *Trump Takes Aim at Windmills Despite Increasing Energy Costs*, NPR (Mar. 24, 2026, at 5:00 AM), https://www.npr.org/2026/03/24/nx-s1-5684158/trump-takes-aim-at-windmills-despite-increasing-energy-costs. While the President stated his opposition to windmills, which use wind for mechanical tasks like grinding grain or pumping water, it appears from context that he was referring to wind turbines, which use wind to generate electricity.

[5] Spencer Kimball, *Offshore Wind Has No Future in the U.S. Under Trump Administration, Interior Secretary Says*, CNBC (Sep. 11, 2025, at 9:45 AM; updated 3:04 PM), https://perma.cc/Z36U-V7Q8.

security."[6] Again, the Administration's efforts to halt offshore wind development were found to be unlawful: in January and February 2026, federal district courts stayed or preliminarily enjoined all five suspension orders, finding that the classified information the courts reviewed *in camera* did not identify any imminent national security risk.

11. When these efforts failed, the Trump Administration tried a new tack: taking money from the Judgment Fund, a permanent appropriation for the payment of judgments against and settlements with the United States, to pay offshore wind developers to walk away. In March 2026, Interior announced that it had reached so-called "settlement agreements" with French energy company TotalEnergies to terminate both of its offshore wind leases on the Outer Continental Shelf in exchange for a payment of $928 million—the amount the company's subsidiaries originally paid for the leases—and a commitment by TotalEnergies to reinvest that $928 million in oil and gas development.

12. One month later, Federal Defendants repeated this maneuver. In April 2026 Interior revealed that it had reached an agreement with Bluepoint Wind and Golden State Wind to terminate their offshore wind leases in the New York Bight and California's Morro Bay and reimburse the companies $765 million and $120 million, respectively, from the Judgment Fund.

[6] BOEM, Acting Director's Orders to Suspend All Ongoing Activities, Issued to Equinor (Empire Leaseholder LLC), Orsted N. Am. Inc. (Revolution Wind LLC and Sunrise Wind LLC), Vineyard Wind 1 LLC, and Va. Elec. & Power Co. (OSW Project LLC) (Dec. 22, 2025), https://perma.cc/92E3-27XF.

13. Federal Defendants repeated it once again on June 17, 2026, when Interior announced that it had reached an agreement to cancel four leases held by Invenergy affiliates in the New York Bight, Gulf of Maine, and Central Coast of California in exchange for paying the developers $765 million from the Judgment Fund. As before, the agreements require the Invenergy affiliates to redirect that money to oil and gas development. According to Federal Defendants, this arrangement constituted a "settlement" of a hypothetical lawsuit that the Invenergy affiliates could have initiated if BOEM had ordered them to suspend operations.

14. These are not the only instances in which the Federal Defendants have used the Judgment Fund to terminate offshore wind projects. As of September 22, 2026, Federal Defendants have, in violation of law, committed to pay more than $4 billion in taxpayer money from the Judgment Fund to cancel offshore wind leases in return for reinvestment of the money in oil and gas development and other energy projects the Administration prefers.

15. Paying offshore wind developers billions of dollars to *not* build new planned sources of generation restricts the supply of electricity at a time of increasing demand and flouts the separation of powers established under the U.S. Constitution. Instead of allowing offshore wind developers to deliver new sources of electricity to the States, Federal Defendants have illegally deprived the States of those new projects to advance the President's unfunded policy objective of promoting oil and gas development in other parts of the country.

16. The Invenergy Lease cancellations should be held unlawful and set aside pursuant to the Administrative Procedure Act (the APA), 5 U.S.C. § 706(2)(A), (D), because they are arbitrary and capricious, are not in accordance with law, and occurred without observance of procedure required by law.

17. The Lease cancellations are arbitrary and capricious because Interior Defendants failed to (1) provide a reasoned explanation for cancelling the Leases; (2) explain their change in position or account for the States' reliance interests; (3) address alternative means of achieving their objectives; or (4) provide a genuine justification for their actions.

18. The Lease cancellations are not in accordance with law and are without observance of procedure required by law in violation of the APA because they violate the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*. They are major federal actions affecting the quality of the human environment, requiring Interior Defendants to consider the impacts of and alternatives to their actions, which they failed to do.

19. The Lease cancellations also violate the APA and the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1349(a)(1), because they are not in accordance with OCSLA or the procedures OCSLA requires. Interior Defendants (1) did not hold a hearing before cancelling the Leases or make the required determination that cancellation was required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) agreed to pay Invenergy the Leases' purchase price without calculating whether that was the fair market value of the Leases at the time of

cancellation, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (3) did not consider the factors Interior Defendants were required to consider under 43 U.S.C. § 1337(p)(4) and 40 C.F.R. § 585.102 or otherwise demonstrate grounds for departing from regulations pursuant to 30 C.F.R. § 585.103; and (4) did not notify or coordinate with the Governors of the affected States in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

20. For those same reasons, the Settlement Agreements that precipitated the Lease cancellations also violate OCSLA, 43 U.S.C. § 1349(a)(1), and are not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2)(A).

21. The Settlement Agreements are further not in accordance with law because they violate the Judgment Fund Act, Antideficiency Act, Purpose Statute, and Miscellaneous Receipts Act. The Settlement Agreements violate the Judgment Fund Act, 31 U.S.C. § 1304, because the $653 million promised to Invenergy (1) is a type of payment otherwise provided for by law, namely, OCSLA, and (2) is not the result of a compromise settlement between adverse parties, but rather an agreement resulting from Interior Defendants' pretextual national security concerns and Invenergy's desire to receive unauthorized compensation for three expensive offshore wind leases. The Agreements violate the Antideficiency Act, Purpose Statute, and Miscellaneous Receipts Act because Federal Defendants' unlawful payment of money that Congress never appropriated contravenes the separation of powers that these statutes are designed to safeguard.

22. The Settlement Agreements are also contrary to constitutional authority, in violation of the separation of powers doctrine, the Spending Clause, the Appropriations Clause, and the APA.

23. Finally, the Settlement Agreements are in excess of statutory authority, 5 U.S.C. § 706(2)(C), and *ultra vires* because no statute authorizes Federal Defendants to use sham settlement agreements to unlawfully cancel offshore wind leases and redirect the money paid for the leases to a separate, unauthorized use favored by the President.

24. The States seek an order: (1) declaring that the Lease cancellations and Settlement Agreements violate the APA, NEPA, OCSLA, the Judgment Fund Act, the Antideficiency Act, the Purpose Statute, and the Miscellaneous Receipts Act; (2) compelling compliance with OCSLA; (3) vacating and setting aside the Lease cancellations and Settlement Agreements; (4) enjoining Federal Defendants from taking further action with respect to the Lease cancellations and Settlement Agreements; and (5) granting such further relief as the Court deems just and proper, including, but not limited to, attorneys' fees and costs.

## PARTIES

25. Plaintiff State of New York is a sovereign State in the United States of America and is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

26. Plaintiff State of New Jersey is a sovereign State in the United States of America and is represented by Attorney General Jennifer Davenport, who is the chief law enforcement officer of New Jersey.

27. Plaintiff State of Connecticut is a sovereign State in the United States of America and is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Connecticut General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

28. Plaintiff State of Delaware is a sovereign State in the United States of America and is represented by Attorney General Kathleen Jennings, who is the chief law enforcement officer of Delaware.

29. Plaintiff State of Maine is a sovereign State in the United States of America and is represented by Attorney General Aaron M. Frey, who is the chief law enforcement officer of Maine.

30. Plaintiff Commonwealth of Massachusetts is a sovereign State in the United States of America and is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

31. Plaintiff State of Rhode Island is a sovereign State in the United States of America and is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

32. Plaintiff State of Vermont is a sovereign State in the United States of America and is represented by Attorney General Charity R. Clark, who is the chief law enforcement officer of Vermont.

33. Defendant Interior is a cabinet agency within the executive branch of the United States government. Interior has responsibility over leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA and its implementing regulations.

34. Defendant Douglas Burgum is the Interior Secretary and Interior's highest-ranking official. He is sued in his official capacity. Interior Secretary Burgum is the federal official ultimately responsible for the management and oversight of leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA and for all official actions or inactions of Interior and BOEM challenged in this action.

35. Defendant BOEM is a bureau within Interior. BOEM is responsible for the administration, leasing, and permitting of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA.

36. Defendant Matthew Giacona is the Acting Director of BOEM and BOEM's highest-ranking official. He is sued in his official capacity.

37. Defendant DOJ is a cabinet agency within the executive branch of the U.S. government. DOJ possesses litigation and settlement authority on behalf of Interior and, consequently, is responsible for submitting Judgment Fund requests on Interior's behalf.

38. Defendant Todd Blanche is Attorney General and DOJ's highest-ranking official. He is sued in his official capacity.

39. Defendant Stanley Woodward is Associate Attorney General and DOJ's second highest-ranking official. He is sued in his official capacity.

40. Invenergy Wind Offshore LLC is a limited liability company that held the Lease in the New York Bight. It is joined as an interested party whose legal rights and obligations may be affected by the relief requested in this litigation.

41. Invenergy NE Offshore Wind LLC is a limited liability company that held the two Leases in the Gulf of Maine. It is joined as an interested party whose legal rights and obligations may be affected by the relief requested in this litigation.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction over this case because it arises under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, namely: the APA, 5 U.S.C. § 706; OCSLA, 43 U.S.C. § 1349; NEPA, 42 U.S.C. §§ 4321 *et seq.*; the Judgment Fund Act, 31 U.S.C. § 1304; the Antideficiency Act, 31 U.S.C. § 1341(a)(1)(A); the Purpose Statute, 31 U.S.C. § 1301(a); and the Miscellaneous Receipts Act, 31 U.S.C. § 3302(b)–(c). The Court also has jurisdiction under the citizen suit provision of OCSLA, 43 U.S.C. § 1349.

43. The Court has personal jurisdiction over all defendants and interested parties because they purposefully directed conduct at this district, including at the Gulf of Maine.

44. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) and 43 U.S.C. § 1349(b)(1). Plaintiff the State of Maine resides in this district, 28 U.S.C. § 1391(e)(1)(C), and Federal Defendants, as United States officers and agencies sued

in their official capacities, "may be found" in this district, 43 U.S.C. § 1349(b)(1); *see* *Superior Oil Co. v. Andrus*, 656 F.2d 33, 35 (3d Cir. 1981).

## LEGAL BACKGROUND

### I. The Outer Continental Shelf Lands Act

45. OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public" and asserts that "the rights and responsibilities of all States . . . to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized." 43 U.S.C. § 1332(3), (5). The law directs the Interior Secretary to facilitate its "expeditious and orderly development" while maintaining competition and environmental safeguards. *Id.* § 1332(3).

46. In 2005, Congress amended OCSLA to authorize the Interior Secretary to issue leases on the Outer Continental Shelf for renewable energy production. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 388, 119 Stat. 594, 744–47. In doing so, Congress sought to "enhance the energy security of the United States," "decrease dependance on foreign sources of fuel," S. Rep. No. 109-78, at 1 (2005), and "ensure jobs for our future with secure and reliable energy," H.R. Rep. No. 109-215, at 1 (2005).

47. To those ends, OCSLA provides detailed requirements for leasing and developing Outer Continental Shelf lands, including, as relevant here, specific procedures that must be followed to cancel or relinquish a lease.

48. Pursuant to OCSLA, the Interior Secretary, in consultation with relevant federal agencies, may "grant a lease, easement, or right of way" for activities that "produce or support production, transportation, storage, or transmission of energy sources other than oil and gas," including offshore wind. 43 U.S.C. §§ 1337(p)(1)(C), 1356c. The Interior Secretary "shall ensure that any activity" authorized "is carried out in a manner that provides for" twelve enumerated factors, including safety, protection of the environment, prevention of waste, protection of national security interests of the United States, and prevention of interference with other reasonable uses of the Outer Continental Shelf. *Id.* § 1337(p)(4). The Interior Secretary shall also "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5), "shall provide for coordination and consultation with the Governor of any State . . . that may be affected by a lease" under OCSLA's offshore wind leasing provision, *id.* § 1337(p)(7), and shall "notify the Governor of any . . . State" affected by a federal action "which has a direct and significant effect on the outer Continental Shelf or its development," *id.* § 1334(h).

49. Under OCSLA, the Interior Secretary may cancel a lease only after determining, "after a hearing," that:

> (i) continued activity pursuant to such lease . . . would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal or human environment;
>
> (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and

> (iii) the advantages of cancellation outweigh the advantages of continuing such lease . . . .

*Id.* § 1334(a)(2)(A).

50. OCSLA provides that a lease cancellation generally "shall not occur unless and until operations under such lease or permit have been under suspension" for a period of five years. *Id.* § 1334(a)(2)(B).

51. OCSLA provides that lease cancellation entitles the lessee to compensation. *Id.* § 1334(a)(2)(C). The lessee may receive "the lesser of":

> (i) the fair value of the canceled rights as of the date of cancellation, taking account of both anticipated revenues from the lease and anticipated costs, including costs of compliance with all applicable regulations and operating orders, liability for cleanup costs or damages, . . . and all other costs reasonably anticipated on the lease, or
>
> (ii) the excess, if any, over the lessee's revenues, from the lease (plus interest . . . ) of all consideration paid for the lease and all direct expenditures made by the lessee after the date of issuance of such lease and in connection with exploration or development, or both, pursuant to the lease.

*Id.*

52. OCSLA also directs the Interior Secretary to prescribe regulations "for the assignment or relinquishment of a lease." *Id.* § 1334(a)(3); *see* 30 C.F.R. § 585.435. A lessee may "surrender a lease . . . by filing with BOEM a properly completed official relinquishment form." 30 C.F.R. § 585.435(a). Relinquishing a lease does not absolve the lessee of the obligation to "[m]ake all payments due on the lease[,] . . . including any accrued rent and deferred bonuses." *Id.* § 585.435(a)(1). OCSLA also does not

provide for any compensation, such as repayment of previous lease payments, to a lessee who voluntarily relinquishes a lease. *See id.*

53. BOEM administers the Outer Continental Shelf leasing program pursuant to its renewable energy regulations under OCSLA, contained in 30 C.F.R. Part 585. BOEM identifies leasing areas, conducts environmental assessments prior to leasing, and then leases the areas out, usually through a competitive bidding process. *Id.* §§ 585.102, .201–.232.

54. Once a lease is sold, a lessee must submit a plan for site assessment activities. *Id.* §§ 585.600, .605–.613. If BOEM approves the site assessment plan, the lessee has five years to conduct site assessment activities to gather necessary data. *Id.* § 585.235(a)(1).

55. BOEM's regulations require BOEM to ensure that activities authorized under its renewable energy regulations are carried out "in a manner that provides for and reaches a rational balance among" the twelve factors enumerated by OCSLA. *Id.* § 585.102(a). The regulations further state that "to the extent [the factors] conflict or are otherwise in tension, none of [the factors] inherently outweighs or supplants any other." *Id.*

## II. The National Environmental Policy Act

56. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Pursuant to that requirement, an agency must take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.

57. To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies may prepare an environmental assessment. *Id.* § 4336(b)(2). If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a finding of no significant impact. *Id.* If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. *Id.* § 4336(b)(1)–(2). Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id.* § 4332(C)(iii), (F), (H).

## III. The Judgment Fund Act

58. The Judgment Fund Act created a permanent, indefinite appropriation administered by the Department of the Treasury from which the federal government may pay final judgments, awards, and compromise settlements. 31 U.S.C. § 1304.

59. The Judgment Fund may only be used when: (1) payment is not otherwise provided for, (2) payment is certified by the Secretary of the Treasury, and (3) the judgment, award, or settlement is payable under certain statutory provisions, including, as relevant here, 28 U.S.C. § 2414. 31 U.S.C. § 1304(a). That provision, 28 U.S.C. § 2414, only allows "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States, or against its agencies or officials upon obligations or liabilities of the United States, made by the Attorney General or any person authorized by him."

60. The U.S. Government Accountability Office's *Principles of Federal Appropriations Law*, known as the Red Book, explains that "[l]itigation is not imminent for purposes of this provision merely because a claimant will sue if the

agency does not pay. There must be a legitimate dispute over either liability or amount. Absent such a dispute or impasse, there is nothing to refer to the Attorney General."[7]

61. The Office of Legal Counsel has similarly concluded that a settlement is payable from the Judgment Fund only if the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached."[8]

## IV. The Constitutional and Statutory Framework for Federal Appropriations and Spending

62. The Appropriations Clause of the U.S. Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause has a "fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

63. The Spending Clause gives Congress the exclusive authority "[t]o lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare to the United States." U.S. Const. art. I, § 8, cl. 1. "Congress has broad power under the Spending Clause . . . to set the terms on

---

[7] 3 Gov't Accountability Off., GAO-08-978SP, Principles of Federal Appropriations Law 14-35 (3d ed. 2008), https://www.gao.gov/assets/2019-11/203470.pdf.

[8] Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. O.L.C. 98, 103 (1989).

which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).

64. In effect, Article I of the U.S. Constitution provides Congress with the exclusive power of the purse. *See* The Federalist No. 78 (Alexander Hamilton) (noting that Congress "commands the purse"). This principle is reinforced in numerous federal statutes, including the Antideficiency Act, Purpose Statute, and Miscellaneous Receipts Act.

65. The Antideficiency Act makes it unlawful for "an officer or employee of the United States Government" to "(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;" or "(B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A), (B). The law "is designed to keep governmental agencies operating within the limits of their appropriated funds." *Nat'l Fed'n of Fed. Emps. v. Devine*, 679 F.2d 907, 913 n.11 (D.C. Cir. 1981).

66. The Purpose Statute, a "core tenet of appropriations law," *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012), provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a).

67. And the Miscellaneous Receipts Act dictates that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or

claim" and that "[a] person having custody or possession of public money . . . shall deposit the money without delay in the Treasury." *Id.* § 3302(b)–(c). In other words, "an agency . . . may not retain for credit to its own appropriations anything Congress has not expressly authorized."[9] *See* Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1364 (1988) ("[T]he Miscellaneous Receipts statute and the Anti-Deficiency Act addressed a chronic problem Congress faced throughout the 19th century: ensuring that executive agencies did not obligate the public fisc except in the amounts appropriated by Congress.").

## FACTUAL ALLEGATIONS

### I. The Federal Government's Consistent Support for Offshore Wind Development from 2005 to 2025

68. Between 2005 and 2025, the federal government consistently supported the development of offshore wind energy. This consistency provided regulatory certainty to offshore wind developers and to the States served by offshore wind projects.

69. In 2005, President George W. Bush signed the Energy Policy Act, which amended OCSLA to allow energy generation on the Outer Continental Shelf from "sources other than oil or gas," such as offshore wind energy. Energy Policy Act of 2005, § 388, 119 Stat. at 744–45. The following year, the Bush Administration

[9] 3 Gov't Accountability Off., *supra* note 7, at 12-125.

opposed a legislative proposal that would have singled out offshore wind projects by subjecting them to additional review.[10]

70. From 2015 to 2016, the Obama Administration oversaw the successful construction of the country's first offshore wind project, the Block Island Wind Farm, off the coast of New York and Rhode Island.

71. From 2017 to 2021, the first Trump Administration supervised an expansion of the country's offshore wind program, conducting competitive lease sales for offshore wind development[11] and environmental reviews for the construction and operation of offshore wind projects.[12]

72. In 2020, President Trump signed legislation that created the Wind Energy Technology Program in the U.S. Department of Energy, to "conduct research, development, demonstration, and commercialization of wind energy technologies," including offshore wind-specific technologies such as floating offshore wind platforms. *See* Energy Act of 2020, Pub. L. No. 116-260, Div. Z, 134 Stat. 1182, 2498–501 (codified at 42 U.S.C. § 16237(b)(1)(A), (2)(B)(iv)). The act appropriated $125 million

---

[10] NGI Staff Reps., *Bush Administration Opposes Measure Threatening to Cape Wind*, Nat. Gas Intel. (May 8, 2006, at 12:00 AM), https://naturalgasintel.com/news/bush-administration-opposes-measure-threatening-to-cape-wind/.

[11] *See, e.g.*, Press Release, Interior, Bidding Bonanza! Trump Administration Smashes Record for Offshore Wind Auction with $405 Million in Winning Bids (Dec. 14, 2018, edited Sep. 29, 2021), https://perma.cc/Z54P-XWUN.

[12] *See, e.g.*, Notice of Availability of a Draft Environmental Impact Statement for Vineyard Wind LLC's Proposed Wind Energy Facility Offshore Massachusetts, 83 Fed. Reg. 63184 (Dec. 7, 2018).

for fiscal years 2021 through 2025 to carry out the Wind Energy Technology Program. 134 Stat. at 2504.

73. In 2021, the Biden Administration set a goal of deploying 30 gigawatts of offshore wind by 2030, enough to power 10 million homes.[13]

74. From 2021 to 2025, Interior, BOEM, and other federal agencies continued to conduct competitive lease sales for, and environmental reviews of, offshore wind projects.[14] During that time, Congress also passed laws directing additional funds and tax credits toward offshore wind development. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 41007(b)(1), 135 Stat. 429, 1129 (2021) (appropriating $60 million to carry out the Wind Energy Technology Program); Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 13052(a), 136 Stat. 1818, 1971–81 (creating the advanced manufacturing production tax credit to support domestic manufacturing of offshore wind components).

## II. The States' Efforts to Develop Offshore Wind

75. Against this backdrop of consistent federal support for offshore wind and consistent application of federal laws and regulations by the federal agencies administering the country's offshore wind program, the States made plans to

[13] Press Release, U.S. Dep't of Energy, Energy Secretary Granholm Announces Ambitious New 30GW Offshore Wind Deployment Target by 2030 (Mar. 29, 2021), https://perma.cc/MHG5-E9P4.

[14] *See, e.g.*, Press Release, Interior, Biden-Harris Administration Marks Major Milestones for Offshore Wind, Approves Tenth Project (Sep. 5, 2024), https://perma.cc/J5ZW-U9QA.

facilitate the development of offshore wind projects and to purchase power from those projects.

76. In 2018, the New York Public Service Commission adopted the Offshore Wind Standard. In doing so, the Public Service Commission recognized that offshore wind:

> is projected to provide numerous benefits in addition to . . . reducing greenhouse gas emissions. Because of its proximity and direct access to load centers, offshore wind would provide substantial reliability and diversity benefits to the electric system. Offshore wind also has the potential to create thousands of jobs for New Yorkers, both in construction of the facilities and in the operations and maintenance of the completed projects. It may also produce significant public health benefits by displacing fossil-fired generation in the downstate area.[15]

77. The Offshore Wind Standard requires utilities and other load-serving entities (entities that provide electricity to customers) to procure offshore wind RECs, which represent the environmental attributes associated with renewable energy generated by offshore wind.

78. In July 2019, the New York State Legislature passed the Climate Leadership and Community Protection Act (the Climate Act), which requires the development of 9 gigawatts of offshore wind energy by 2035. Climate Act, 2019 N.Y. Laws ch. 106, § 4(5); N.Y. Pub. Serv. Law § 66-p(5). The Climate Act also sets broader greenhouse gas emission-reduction targets of 40% from 1990 levels by 2030 and 85% from 1990 levels by 2050. Climate Act §§ 1–2; N.Y. Env't Conserv. Law § 75-0107. It

---

[15] Order Establishing Offshore Wind Standard and Framework for Phase 1 Procurement at 3, *In re Offshore Wind Energy*, No. 18-E-0071 (N.Y. Pub. Serv. Comm'n July 12, 2018), NYSDPS-DMM Item No. 49.

calls for New York's electricity sector to be 100% free of greenhouse gas emissions by 2040, with 70% of that electricity generated by renewable energy sources. Climate Act § 1(12)(d); N.Y. Pub. Serv. Law § 66-p(2).

79. The New York State Energy Research and Development Authority (NYSERDA), a public benefit corporation and public authority incorporated under Title 9 of the New York State Public Authorities Law, administers New York's Offshore Wind Standard pursuant to orders issued by the New York Public Service Commission and in furtherance of the goals of the Climate Act. As administrator of this program, NYSERDA administrates offshore wind solicitations, which seek proposals from offshore wind developers to deliver offshore wind energy to New York. The competitively selected projects enter into contracts to sell RECs to NYSERDA, which then sells the certificates to utilities and other load-serving entities to comply with the Offshore Wind Standard.

80. Likewise, New Jersey, with its extensive coastline, has taken steps to facilitate offshore wind development. In 2010, the New Jersey Legislature enacted the Offshore Wind Economic Development Act, which authorized the New Jersey Board of Public Utilities (NJBPU) to conduct solicitations for offshore wind projects to receive offshore wind RECs in exchange for providing electricity to the New Jersey electric grid. The goal of these solicitations was to enable a percentage of New Jersey's electric load to be supplied by offshore wind energy. In 2018, New Jersey's initial statutory requirement of 1.1 gigawatts of offshore wind energy was increased to 3.5 gigawatts. 2018 N.J. Laws ch. 17 § 2; NJ. Stat. Ann. § 48:3-87(d)(4).

81. New Jersey has further promoted the development of offshore wind by adopting legislation to reduce greenhouse gas emission reductions. For instance, New Jersey passed the Global Warming Response Act, which requires the State to achieve 80% reductions from 2006 greenhouse gas emissions by 2050. 2007 N.J. Laws ch. 112, § 2; N.J. Stat. Ann. § 26:2C-38. As the power generation sector is the sector that emits the second-largest volume of greenhouse gases, reducing those emissions is key to achieving these goals.

82. By 2022, through a series of executive orders, statutory enactments, and policy planning documents, New Jersey's offshore wind-generation goal increased from 7.5 gigawatts by 2035 to 11 gigawatts by 2040, and the State accelerated the timeline for reaching its goal of 100% clean energy from 2050 to 2035. N.J. Exec. Order No. 307 (Sep. 21, 2022); N.J. Exec. Order No. 315 (Feb. 15, 2023).

83. Maine has enacted a goal of developing at least 3 gigawatts of installed offshore wind capacity by the end of 2040. Me. Stat. tit. 35-A, § 3404(2). The State also has a Renewable Portfolio Standard that requires that 80% of electricity be generated by renewable resources by the year 2030 and 100% clean energy by 2040. Maine must achieve carbon neutrality, or net-zero emissions, no later than 2045. *Id.* tit. 38, § 576-A.

84. Massachusetts has made significant efforts to develop offshore wind energy. In 2022, Massachusetts enacted An Act Driving Clean Energy and Offshore Wind. 2022 Mass. Acts, ch. 179. The Act aimed to move Massachusetts toward its mandate of net-zero greenhouse gas emissions by 2050 through the promotion and

development of offshore wind, including by requiring procurement of 5,600 megawatts of offshore wind by June 30, 2027. *Id.* § 61(b). Massachusetts also has a Renewable Portfolio Standard, which requires that retail energy suppliers annually increase the share of renewable energy generation that is supplied to electricity customers. Mass. Gen. Laws ch. 25A, § 11F.

85. The Act Driving Clean Energy and Offshore Wind directed the Massachusetts Department of Energy Resources to coordinate and lead a wind-energy procurement process. Massachusetts has thus far completed three rounds of procurements, and a fourth round is presently ongoing. One project selected by the Commonwealth is presently online and can supply 800 megawatts of electricity, which is enough to power over 400,000 homes and businesses in Massachusetts.

86. The other New England States and Delaware have also adopted policies to encourage renewable energy development, including offshore wind development, which are discussed in more detail at ¶¶ 187-203.

## III. BOEM's Decision to Award the Leases to Invenergy and Invenergy's Plans to Develop the Lease Areas

### A. The New York Bight Lease

87. In October 2017, New York sent BOEM a document identifying an "area for consideration for the potential locating of offshore wind energy areas."[16] The area

[16] Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight—Call for Information and Nominations, 83 Fed. Reg. 15602, 15603–04 (Apr. 11, 2018).

was located in the New York Bight, a large, shallow section of ocean between Long Island and the New Jersey coast.

88. The following spring, BOEM published a call for information and nominations, in which it requested public comment about potential commercial wind leasing opportunities in the New York Bight. After receiving responses to its call for information, BOEM began the process of identifying "wind energy areas," the areas of the New York Bight most suitable for leasing.

89. As part of its identification process, BOEM coordinated with DOD to assess the potential wind energy areas' compatibility with national security. DOD identified portions of the New York Bight as "wind exclusion" areas due to the potential conflict of wind turbines with military exercise areas and with weather radar, depending on the height of the turbines.

90. In response, BOEM withdrew some of its recommended wind energy areas from consideration and promised to work with the U.S. Air Force to ensure that any future development adopted appropriate mitigation measures. BOEM also announced its intent to continue working with DOD to ensure that any wind energy projects selected for construction would adopt mitigation measures to avoid potential impacts to the North American Aerospace Defense Command's air surveillance radar.

91. In early 2021, after more than three years of review and stakeholder engagement, BOEM identified almost 800,000 acres in the New York Bight as suitable for wind energy development. A few months later, BOEM proposed to offer eight New York Bight lease areas for sale in a competitive auction.

92. BOEM subsequently conducted an environmental analysis that assessed the potential impacts of the issuance of the proposed leases, including the environmental consequences associated with site characterization and assessment. In January 2022, BOEM published a final sale notice in which it described its plan to auction off six offshore leases in the New York Bight.

93. BOEM held the auction in February 2022. The auction drew winning bids from six developers that totaled around $4.37 billion, making it the country's highest-grossing competitive offshore energy lease sale in history.

94. Invenergy bid $645 million and won lease number OCS-A 0542, a lease area of around 84,000 acres located about 69 nautical miles off the New York coast and 35 nautical miles off the New Jersey coast. Invenergy's Lease area is depicted in blue and marked with an "x" at the southern edge of the map below:




95. In April 2022, Invenergy entered into a Lease agreement with BOEM.

96. One year later, Invenergy sent BOEM a letter stating that it would not conduct site assessment activities and would instead develop the Lease area based on existing data.

97. In January 2024, the New York Bight Invenergy project received an award from NJBPU to produce offshore wind energy.

98. In October 2024, BOEM issued a final programmatic environmental impact statement analyzing the potential impact of wind energy development in the

six lease areas in the New York Bight. BOEM recognized the importance to New York and New Jersey of developing the lease areas in the New York Bight, stating that it "would assist with meeting several state mandates for renewable energy" and referencing New York's goal of procuring 9 gigawatts of offshore wind energy by 2035 and New Jersey's goal of procuring 11 gigawatts of offshore wind energy by 2040.[17]

99. Two months later, BOEM issued a record of decision identifying the avoidance, minimization, mitigation, and monitoring measures that BOEM would apply as conditions of approval of the six developers' construction and operations plans. The record of decision specifies that the developers must coordinate with certain radar operators, including DOD's Military Aviation and Installation Assurance Siting Clearinghouse, to assess whether any of the offshore wind projects could impermissibly interfere with radar, and if so, to institute mitigation measures.

100. In January 2025, Invenergy and BOEM entered into an amended Lease agreement. The amended agreement provides that "[a]ny cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities."[18] The amended

[17] 1 BOEM, BOEM 2024-051, New York Bight Final Programmatic Environmental Impact Statement at ES-4 (Oct. 2024), https://perma.cc/626Q-UH65.

[18] Amendment and Restatement of Renewable Energy Lease Agreement OCS-A 0542 Between the United States of America and Invenergy Wind Offshore LLC § 8 (fully executed Jan. 16, 2025).

agreement also affirms that "[a]ny cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of [OCSLA] (43 U.S.C. § 1334(a)(2)(B) and (C))."[19]

**B. The Gulf of Maine Leases**

101. In January 2019, the Governor of New Hampshire requested the establishment of an intergovernmental offshore wind renewable energy task force for the State. Given the regional nature of offshore wind development, BOEM established a Gulf of Maine task force, which included federal and tribal officials and state and local officials from Maine, New Hampshire, and Massachusetts.

102. In May 2022, BOEM released a Gulf of Maine "wind planning area," the starting point for the leasing process, to discuss with the task force. BOEM subsequently published a request for interest to determine whether companies would be interested in developing offshore wind energy there.

103. The next year, after receiving nominations of areas of interest from five developers, BOEM published a call for information and nominations to obtain public comment on commercial wind leasing in the Gulf of Maine. After receiving responses, BOEM identified possible wind energy areas there.

104. As with the New York Bight, BOEM coordinated with DOD to assess the potential wind energy areas' compatibility with national security and military operations. Although DOD's Military Aviation and Installation Assurance Siting Clearinghouse identified potential impacts to the North American Aerospace Defense

[19] *Id.*

Command's radar, BOEM explained that "[s]imilar impacts have been encountered with other lease areas along the Atlantic Coast and have been largely if not entirely mitigated."[20]

105. In March 2024, BOEM identified around 2 million acres in the Gulf of Maine as suitable for wind energy development. The following month, BOEM proposed to offer eight Gulf of Maine lease areas for sale in an auction.

106. BOEM subsequently conducted an environmental analysis that assessed the potential impacts of the issuance of the proposed leases. In September 2024, BOEM published a final sale notice in which it described its plan to auction off eight offshore leases.

107. BOEM held the lease sale in October 2024. Invenergy won lease number OCS-A 0562 for $4,892,700 and lease number OCS-A 0567 for $5,889,000. The first Gulf of Maine Lease consisted of 97,854 acres located around 46 nautical miles from Maine, and the second Gulf of Maine Lease consisted of 117,780 acres located around 22 nautical miles from Massachusetts. The Lease areas are depicted in green and marked with an "x" in the map below:

[20] Memorandum from Karen Baker, Chief, BOEM Off. of Renewable Energy, to Director, BOEM (Mar. 13, 2024), https://perma.cc/W8GY-BUCP.




108. In December 2024, Invenergy entered into Lease agreements with BOEM for these two Leases. Pursuant to the Lease agreements, Invenergy was required to spend $1,347,712.50 of the Lease purchase prices on workforce training and/or domestic supply chain development and $1,347,712.50 of the Lease purchase prices on mitigating any adverse impacts to fisheries resulting from Lease development.

109. In January 2025, Invenergy and BOEM entered into two amended Lease agreements. The amended agreements, like the amended agreement for Invenergy's New York Bight Lease, provide that "[a]ny cancellation or suspension ordered by the

Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities" and that "[a]ny cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of [OCSLA] (43 U.S.C. § 1334(a)(2)(B) and (C))."[21]

## IV. The Trump Administration's Unlawful Attempts to Hinder the Development of Wind Energy

110. President Trump's inauguration to a second term in January 2025 abruptly reversed two decades of consistent support for the country's offshore wind program. Moreover, the second Trump Administration's illegal actions to hinder offshore wind development shattered the regulatory certainty that federal agencies had fostered across multiple presidential administrations through consistent application of federal laws and regulations in reviewing and permitting these projects.

111. These efforts have repeatedly been found unlawful and enjoined by federal courts.

112. On January 20, 2025, President Trump issued a memorandum that withdrew all areas of the Outer Continental Shelf from consideration for wind energy

[21] Amendment of Renewable Energy Lease Agreement OCS-A 0562 Between the United States of America and Invenergy NE Offshore Wind LLC § 8 (fully executed Jan. 16, 2025); Amendment of Renewable Energy Lease Agreement OCS-A 0567 Between the United States of American and Invenergy NE Offshore Wind LLC § 8 (fully executed Jan. 16, 2025).

leasing and halted all federal approvals necessary for the development of offshore and onshore wind energy (the Wind Memo). Pursuant to the Wind Memo, several federal agencies immediately stopped issuing any wind energy authorizations.

113. On December 8, 2025, the U.S. District Court for the District of Massachusetts issued a memorandum and order declaring that the pause "constitutes a final agency action that is arbitrary and capricious and contrary to law" and vacating it. *New York v. Trump*, 811 F. Supp. 3d 215, 226 (D. Mass. 2025). The federal government ultimately did not pursue an appeal of that decision.

114. The same day the Wind Memo was issued, President Trump also declared a "National Energy Emergency" (the Energy Emergency Memo), asserting that there was "insufficient energy production" in the United States and directing agencies to expedite and facilitate "energy" development.[22] The Energy Emergency Memo defined "energy" to exclude wind and solar facilities.

115. In response to the Energy Emergency Memo, in April 2025, Interior announced that it would "implement emergency permitting procedures to accelerate the development of domestic energy resources," excluding wind and solar facilities.[23] As part of these procedures, Interior "will be adopting an alternative National Environmental Policy Act compliance process to allow for more concise documents

---

[22] Exec. Order No. 14156, 90 Fed. Reg. 8433, 8434 (Jan. 29, 2025).

[23] Press Release, Interior, Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply (Apr. 23, 2025), https://perma.cc/SY6T-YTGS.

and a compressed timeline. Projects requiring a full environmental impact statement, typically a two-year process, will be reviewed in roughly 28 days."[24]

116. Also in April 2025, BOEM issued an order requiring Empire Wind, a wind farm under construction in the New York Bight, to "halt all ongoing activities related to the Empire Wind Project on the outer continental shelf to allow time for [BOEM] to address feedback it has received, including from the National Oceanic and Atmospheric Administration (NOAA), about the environmental analyses for that project."[25] BOEM described this order as an "outgrowth" of the review that Interior was undertaking pursuant to President Trump's Wind Memo. The following month, BOEM lifted the order without explanation.

117. In July 2025, President Trump issued another executive order targeting wind energy, this time directing the Interior Secretary to eliminate all sources of "preferential treatment" for wind and solar energy.[26] The executive order characterized wind energy as "expensive and unreliable," as "denigrat[ing] the beauty of our Nation's natural landscape," and as "threaten[ing] national security by making the United States dependent on supply chains controlled by foreign adversaries."[27]

118. In August 2025, BOEM issued another order, now directing a halt to work on Revolution Wind, a wind farm under construction off the coast of Rhode

---

[24] *Id.*

[25] BOEM, Acting Director's Order to Halt All Ongoing Activities Issued to Empire Offshore Wind LLC (Apr. 16, 2025), https://perma.cc/X8UY-QJ3Q.

[26] Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 10, 2025).

[27] *Id.* § 1.

Island. BOEM stated that this order was the result of a national security review undertaken pursuant to President Trump's Wind Memo. The project developer sought judicial review of the order, and a few weeks later, the U.S. District Court for the District of Columbia granted the developer's motion for a preliminary injunction, finding that the developer had demonstrated a likelihood of success on the merits. Specifically, the court explained that BOEM's order represented "a clear change in position on the part of [BOEM], which previously certified that the [Revolution Wind] project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process," and that BOEM "did not make any factual findings or cite any reasons to believe that [] Revolution Wind was no longer in compliance with [OCSLA]." Tr. of Prelim. Inj. Hr'g at 41:1–5, :13–16, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sep. 26, 2025), ECF No. 39.

119. On December 22, 2025, Acting Director Giacona issued orders directing five offshore wind projects, including Empire Wind and Revolution Wind, to "suspend all ongoing activities related to the [projects] on the Outer Continental Shelf for the next 90 days for reasons of national security."[28] These single-page suspension orders were purportedly based on "national security threats" identified in a November 2025 classified assessment conducted by DOD. The suspension orders stated that BOEM could "further extend the 90-day suspension" pending its discussions with DOD.[29]

---

[28] BOEM, Acting Director's Orders to Suspend All Ongoing Activities, *supra* note 6.
[29] *Id.*

120. Between January and February 2026, federal district courts stayed or preliminarily enjoined all five suspension orders based on determinations that the classified assessment, which the courts reviewed *in camera*, did not identify the immediate national security risk asserted by BOEM. Prelim. Inj., *Revolution Wind* (Jan. 12, 2026), ECF No. 63; Min. Order, *Empire Leaseholder LLC v. Burgum*, No. 26-cv-04 (D.D.C. Jan. 14, 2026); Order, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 25-cv-830 (E.D. Va. Jan. 16, 2026), ECF No. 81; Elec. Order, *Vineyard Wind 1 LLC v. U.S. Dep't of the Interior*, No. 26-cv-10156 (D. Mass. Jan. 27, 2026), ECF No. 71; Min. Order, *Sunrise Wind LLC v. Burgum*, No. 26-cv-28 (D.D.C. Feb. 2, 2026).

121. In April 2026, a federal district court preliminarily enjoined various federal agencies, including Interior and BOEM, from enforcing several actions designed to inhibit the development of wind and solar energy, including a July 2025 Interior memo that mandated additional review procedures for wind and solar energy projects and an August 2025 order by Interior Secretary Burgum directing Interior to consider a proposed energy project's "capacity density" when reviewing project applications, a metric that was designed to disadvantage wind and solar energy. *RENEW Ne. v. U.S. Dep't of the Interior*, No. 25-cv-13961, 2026 WL 1078282 at *1 (D. Mass. Apr. 21, 2026), *appeal docketed*, No. 26-1731 (1st Cir. June 24, 2026). The court found that each of the challenged actions was likely arbitrary and capricious or contrary to law.

122. The Trump Administration's actions reflect a concerted effort to hinder the development of wind energy, an industry that is critically important to the States.

123. Those actions are consistent with statements by Interior Secretary Burgum and President Trump vociferously opposing wind energy.

124. Interior Secretary Burgum has described offshore wind energy as "a scam"[30] and "one of the most expensive, unreliable, subsidy-dependent schemes ever pushed upon American taxpayers."[31] He has also stated that, "[u]nder this administration, there is not a future for offshore wind because it is too expensive and not reliable enough."[32]

125. President Trump, meanwhile, has called wind "the worst" and "most expensive form of energy" and has stated that offshore wind projects "kill your birds" and "ruin your beautiful landscapes."[33] Earlier this year, he announced that "my goal is not to build any windmills in this country."[34] President Trump recently told Interior Secretary Burgum that "I can proudly say, Doug, that we have not approved one windmill since I've been in office. And we're going to keep it that way. My goal is to not let any windmill be built."[35]

---

[30] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, at 2:04 PM), https://perma.cc/X6RE-E3WQ.

[31] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 3:23 PM), https://perma.cc/55JT-MKJT.

[32] Kimball, *supra* note 5.

[33] Helena Horton, *Tilting at Windmills? Trump's Claims About Turbines Fact-Checked*, The Guardian (July 28, 2025, at 8:21 AM), https://perma.cc/97Z7-YMDZ; Reuters, *Trump Orders Suspension of New Offshore Wind Power Leasing* (Jan. 21, 2025, at 11:03 AM), https://perma.cc/KCH9-98FZ.

[34] Aaron Rupar (@atrupar), X (Jan. 9, 2026, at 4:10 PM), https://perma.cc/CAX7-M2T5.

[35] Keith, *supra* note 4.

## V. Federal Defendants Take Money from the Judgment Fund to Pay Offshore Wind Developers to Abandon Their Leases

### A. The First Settlement Agreements

126. Despite these repeated losses in court, Federal Defendants have now devised a new strategy to suppress the growth of the offshore wind industry: paying developers to walk away from their leases.

127. In March 2026, Interior announced that it had reached an agreement with TotalEnergies to cancel its wind leases off the coast of New York and North Carolina. The press release explained that, in exchange for the cancellation of its two leases, TotalEnergies would be reimbursed $928 million from the U.S. government and would spend an equivalent amount on the construction of a liquefied natural gas plant and the development of upstream conventional oil and shale gas production.

128. Federal Defendants later published the settlement agreements. According to the agreements, DOD had raised classified national security concerns that would have caused Federal Defendants to indefinitely suspend construction on the TotalEnergies leases, and TotalEnergies would have sued. To settle this hypothetical suit, Federal Defendants would reimburse TotalEnergies $928 million and cancel the leases in exchange for TotalEnergies agreeing to invest $928 million in oil and gas development and covenanting not to sue.

129. The recitations in the TotalEnergies settlement agreements do not reflect the actual chronology of events and do not show that litigation was imminent, as required to use the Judgment Fund.

130. The parties to the settlement agreements were effectively on the same side. TotalEnergies first approached Interior to propose that Interior cancel its leases so that TotalEnergies could receive a refund. Indeed, TotalEnergies' chief executive officer asserted that that settlement agreements "came from us—we took the initiative."[36]

131. Notably, although the TotalEnergies settlement agreements assert that, had Interior Defendants not reached settlements with TotalEnergies, BOEM "would have issued" suspension orders "due to national security concerns, similar to" BOEM's five December 2025 suspension orders, documents obtained through Freedom of Information Act requests show that Interior and BOEM were working on a "memorandum of understanding" with TotalEnergies as early as November 16, 2025, before BOEM Acting Director Giacona first reviewed the classified information that purportedly motivated the suspension orders, Decl. of Matthew Giacona ¶ 6, *Sunrise Wind* (Jan. 23, 2026), ECF No. 31-1 (declaration from Acting Director Giacona affirming that he first reviewed the classified information on November 26, 2025).

132. Moreover, the settlement agreements do not discuss a referral to the Attorney General or evince any substantive involvement by DOJ, which is responsible for negotiating any settlement that requires a payment from the Judgment Fund. *See* 30 C.F.R. § 256.1. Nor do any DOJ personnel appear on Interior emails from

[36] Amy Harder, *TotalEnergies CEO on Controversial Offshore Wind Deal: "It's Our Money"*, Axios (Apr. 17, 2026), https://www.axios.com/2026/04/17/totalenergiestrump-offshore-wind-deal.

November and December 2025 containing draft "contract[s] of mutual recission" and "memorand[a] of understanding" between Interior and TotalEnergies.

133. Then, in April 2026, Interior issued a press release announcing that, "following the model of its recent deal with TotalEnergies," wind developers Bluepoint Wind and Golden State Wind had each agreed to buyouts of their leases.[37] In exchange for the cancellation of their leases and investing in oil and gas development, Bluepoint Wind and Golden State Wind would receive "dollar-for-dollar reimbursements" of $765 million and $120 million, respectively.[38]

134. As before, these agreements were not entered to settle any imminent litigation, as required to use the Judgment Fund.

135. Rather, as shown by documents obtained through Freedom of Information Act requests, Bluepoint Wind and Golden State Wind first articulated a legal justification for the reimbursement of their lease prices in February 2026, over a month after the developers met with Federal Defendants to discuss cancelling their respective leases.

**B. The Invenergy Settlement Agreements**

136. On June 17, 2026, Invenergy became the next developer to enter into unlawful agreements with the Federal Government to cancel its leases.

---

[37] Press Release, Interior, Interior Announces Two Historic Agreements to Promote Affordable, Reliable Energy Production in the United States (Apr. 27, 2026), https://perma.cc/WLT9-7H3U.

[38] *Id.*

137. That day, Interior revealed that it had entered into agreements with Invenergy affiliates to cancel four offshore wind leases, one in the New York Bight, two in the Gulf of Maine, and one off California's Central Coast.

138. According to Interior, Invenergy would receive $765 million, the combined purchase price of the leases, and "redirect that amount towards other domestic energy sources with the demonstrated capability to deliver reliable, affordable power, including the development of natural gas-fired power plants in Indiana, Wisconsin, Iowa, Kansas, and Missouri and geothermal power generation projects in the Western U.S."[39] Interior explained that by cancelling these "costly" and "unreliable" leases and "encouraging investment in reliable, cost-effective conventional energy sources, the settlement agreements promote mutually beneficial projects designed to deliver strong returns for American taxpayers."[40]

139. In the same press release, Associate Attorney General Woodward noted that "[t]he Department of Justice looks forward to continued cooperation from companies that are reevaluating their energy investments."[41]

140. The Settlement Agreements, which Federal Defendants and Invenergy executed on June 12, 2026, state that DOD "raised classified national security concerns about development of offshore leases that were not known to BOEM at the

---

[39] Press Release, Interior, Interior Announces New Energy Agreement to Strengthen American Energy Security and Lower Costs (June 17, 2026), https://perma.cc/XE28-7CW8.

[40] *Id.*

[41] *Id.*

time of lease issuance and that may have prevented the lease issuance if they had been considered." Ex. 1, Settlement Agreement Between the United States and Invenergy Wind Offshore LLC Re: Lease No. OCS-A 0542 (NY Bight Settlement Agreement) at 2 (June 12, 2026); Ex. 2, Settlement Agreement Between the United States and Invenergy NE Offshore Wind LLC Re: Lease No. OCS-A 0562 (Gulf of Maine 1 Settlement Agreement) at 2 (June 12, 2026); Ex. 3, Settlement Agreement Between the United States and Invenergy NE Offshore Wind LLC Re: Lease No. OCS-A 0567 (Gulf of Maine 2 Settlement Agreement) at 2 (June 12, 2026). "[I]f th[ese] offshore wind project[s] would have continued," the Settlement Agreements read, "BOEM would have issued to [Invenergy] order[s] to suspend construction and operations of th[ese] project[s] indefinitely due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." NY Bight Settlement Agreement at 2; Gulf of Maine 1 Settlement Agreement at 2; Gulf of Maine 2 Settlement Agreement at 2.

141. The Settlement Agreements further state that, had BOEM issued suspension orders, Invenergy "could have claimed breach of contract . . . and filed suit in the United States Court of Federal Claims." NY Bight Settlement Agreement at 2; Gulf of Maine 1 Settlement Agreement at 2; Gulf of Maine 2 Settlement Agreement at 2.

142. The Settlement Agreements require Invenergy to spend $653,086,275—the amount it paid for the Leases—on "eligible expenditures" directed toward "conventional energy projects," i.e., fossil fuel-based energy projects. NY Bight

Settlement Agreement at 4; Gulf of Maine 1 Settlement Agreement at 4; Gulf of Maine 2 Settlement Agreement at 4. The Settlement Agreements allow Invenergy to apply past expenditures made since January 1, 2026, toward the $653,086,275. Once Invenergy has made and accounted for those expenditures, the Settlement Agreements state, Interior will cancel the Leases and "submit a request for payment . . . to the Judgment Fund Branch at the United States Department of the Treasury's Bureau of the Fiscal Service." NY Bight Settlement Agreement at 4–5; Gulf of Maine 1 Settlement Agreement at 4; Gulf of Maine 2 Settlement Agreement at 4.

143. Pursuant to the Settlement Agreements, Interior canceled the two Gulf of Maine Leases by letter on July 10, 2026.

144. The letters reiterate Interior's assertion that it "would not have issued the lease[s] in December 2024 had it known the sensitive information that it recently learned from the Department of [Defense]." Ex. 4, Letter from Matthew Giacona, Acting Director, BOEM, to Daniel Runyan, Senior Vice President, Invenergy NE Offshore Wind LLC, Re: Lease No. OCS-A 0562 (Gulf of Maine 1 Letter) at 1 (July 10, 2026); Ex. 5, Letter from Matthew Giacona, Acting Director, BOEM, to Daniel Runyan, Senior Vice President, Invenergy NE Offshore Wind LLC, Re: Lease No. OCS-A 0567 (Gulf of Maine 2 Letter) at 1 (July 10, 2026).

145. The letters further state that, on July 6, 2026, Invenergy provided Interior with documentation demonstrating that the company had already made $8,086,275 of eligible expenditures on oil and gas projects. Accordingly, per the letter, Interior was "cancelling and rescinding" the Gulf of Maine Leases and would,

"through the Department of Justice, request payment . . . from the Judgment Fund Branch at the United States Department of Treasury." Gulf of Maine 1 Letter at 1; Gulf of Maine 2 Letter at 1.

### C. Other Settlement Agreements

146. Two days after announcing the Invenergy deal, Interior announced another lease cancellation and settlement agreement, this time for Duke Energy's former lease in the Carolina Long Bay, and in early August 2026, RWE U.S. Offshore announced that Interior would pay it $1.22 billion to cancel three leases off the coast of New York, California, and Louisiana.

147. In total, as of September 22, 2026, Federal Defendants have unlawfully agreed to pay more than $4 billion of taxpayer money from the Judgment Fund in the middle of an energy affordability crisis to advance the President's policy objective of suppressing the growth of the country's offshore wind industry.

## VI. The States' Harms

148. The Settlement Agreements and Lease cancellations have significant impacts on and cause harm to the States.

### A. New York Is Harmed by the New York Bight Lease Cancellation and Settlement Agreement

149. The New York Bight Lease cancellation and the Settlement Agreement that precipitated it harm New York's energy, economic, and environmental and public health interests. Further, New York has significant reliance interests in the New York Bight Lease. As discussed below, New York has relied on the development of the Lease area as a component of its strategy to support grid reliability and energy

diversification, economic growth, climate goals, and environmental and public health. In cancelling the New York Bight Lease, Interior Defendants did not acknowledge these reliance interests.

*1. New York's Energy Interests*

150. The New York Bight Lease cancellation and Settlement Agreement will harm New York's energy interests by depriving New York of a planned source of offshore wind energy that would have been sufficient to serve 1.5 million homes in New York City and the surrounding area.

151. Offshore wind energy is critical to meeting New York's growing need for reliable, affordable, and clean energy. According to analysis performed for the 2025 New York State Energy Plan, future electricity demand is projected to grow and will require investments in the expansion of the electric system, including the development of new offshore wind projects.

152. Maintaining the reliability of New York's electric system will require substantial deployment of new energy resources, such as offshore wind, alongside modernization of essential transmission and distribution infrastructure. According to the 2025 State Energy Plan, economic development and the operation of data centers are expected to cause substantial increases in electricity demand—8% above 2025 levels by 2030 alone, with demand rising to 24% above 2025 levels by 2040 and 42% above 2025 levels by 2050.

153. At the same time, New York's Independent System Operator (NYISO) reports that by 2028, 6.5 gigawatts of fossil fuel generation in New York will reach an age beyond which 95% of similarly aged U.S. generators are expected to retire.

Aging generators pose reliability risks even when they are extended, meaning that investment to backfill these resources is essential for long-term reliability.

154. Consistent with those findings, NYISO, in its October 2025 Q3 Short-Term Assessment of Reliability (STAR) Report, identified a need for additional electricity generation, demand-side solutions, and/or transmission solutions to ensure electric system reliability in New York City as early as summer 2026. NYISO's 2026 Q1 STAR Report, issued in April 2026, confirms a continuing reliability need.

155. Each offshore wind lease in the New York Bight constitutes an important component of New York's efforts to secure enough offshore wind energy to meet demand, and the loss of any lease makes it less likely that New York will achieve its energy goals.

156. Wind energy facilities built on the Lease area could have interconnected directly into New York's Load Zone J, the load zone for New York City.

157. Those wind energy facilities would provide critical energy diversity benefits (benefits from having diverse sources of electricity) to New York City. A recent analysis commissioned by NYISO found that the availability of a large quantity of offshore wind energy transmitted directly into New York City would enhance grid reliability in cold weather by reducing dependency on oil and gas.

158. The New York Bight Lease cancellation, combined with other nearby lease cancellations, will severely reduce available energy production in the New York Bight.

159. The Invenergy project could have generated 2.4 gigawatts of clean wind energy, enough to power around 1.5 million homes. Together, the canceled Invenergy, TotalEnergies, Bluepoint Wind, and RWE wind projects in the New York Bight could have added approximately 11.1 gigawatts of generating capacity to serve the New York downstate load.

160. The settlement agreements that facilitated these lease cancellations also serve as a blueprint for other offshore wind leaseholders to receive compensation for the cancellation of their leases, an appealing prospect for project developers that have obligations to shareholders and that are unable to make progress on projects due to the Trump Administration's opposition to wind energy. If other leaseholders make similar deals with Interior, the amount of energy production available in the New York Bight may be reduced by as much as 80%, further eroding New York's ability to rely on offshore wind resources as part of its planning for a reliable and diverse energy portfolio.

161. The importance of each offshore wind lease in the New York Bight is magnified by the unlawful cancellation of other offshore wind leases and the publication of the Wind Memo on January 21, 2025, which made all areas of the Outer Continental Shelf that were not leased as of that date unavailable for future wind energy leasing. The lease cancellations and Wind Memo drastically limit the locations available for offshore wind projects.

162. New York's efforts to diversify its energy supply and enhance grid resiliency and capacity in order to support downstate electric load growth while also

meeting its climate goals, including the procurement of 5 to 7 gigawatts of offshore wind energy by 2040, will be compromised if the New York Bight Lease cancellation is not set aside.

*2. New York's Economic Interests*

163. The New York Bight Lease cancellation and Settlement Agreement will also inflict economic harms on New York.

164. Extrapolating from Empire Wind and Sunrise Wind, the two projects under construction off the coast of New York, the New York Bight Invenergy project could have delivered hundreds of millions of dollars in economic benefits to New York over its lifetime. These anticipated economic benefits include inducing $8.3 billion in in-State investment. Further, a project of a similar size would be expected to generate substantial tax revenue and to create 1,400 new in-State jobs.

165. The New York Bight Lease cancellation will deprive New York of the economic benefits that would have resulted from development of the Lease area by Invenergy or another offshore wind developer. Further, the New York Bight Lease cancellation will chill the investment in and development of offshore wind energy in New York, cutting off a significant new source of economic benefits to the State. These economic benefits include jobs, investments in electrical infrastructure, substantial tax revenues, and payments in lieu of taxes.

166. Further, NYSERDA has expended substantial resources to promote the development of offshore wind energy in the New York Bight. As a result of the New York Bight Lease cancellation, NYSERDA will need to redirect additional resources

to analyze the impact of the cancellation and to determine whether the clean energy that would have come from Invenergy's development of the Lease can be replaced.

167. The New York Bight Lease cancellation will also impose market harms on New York, likely making it more expensive for New York to procure offshore wind energy in the future. NYSERDA solicits proposals from offshore wind developers through competitive solicitations, a process that allows NYSERDA to secure contracts with offshore wind developers at lower cost than it would through noncompetitive awards.

168. Because so few leases currently exist in the New York Bight, the loss of any one lease—here, the New York Bight Invenergy Lease—increases the chance that NYSERDA's future offshore wind solicitations will not be as competitive, likely increasing the price New York must pay to procure offshore wind energy.

*3. New York's Climate Goals and Environmental and Public Health Interests*

169. Finally, the New York Bight Lease cancellation and Settlement Agreement will adversely affect New York's ability to mitigate climate change and the health effects of fossil fuel-based energy.

170. The New York State Legislature enacted the Climate Act in July 2019. The Climate Act, as amended, sets greenhouse gas-reduction targets of 40% from 1990 levels by 2030 and 85% from 1990 levels by 2050. Climate Act §§ 1–2; N.Y. Env't Conserv. Law § 75-0107. It calls for New York to have a 100% emissions-free electricity sector by 2040 and to be powered by 70% renewable energy. Climate Act § 1(12)(d); N.Y. Pub. Serv. Law § 66-p(2). The Climate Act also targets the

development of 9 gigawatts of offshore wind energy by 2035. Climate Act § 4(5); N.Y. Pub. Serv. Law § 66-p(5).

171. Offshore wind projects are expected to play a significant role as New York pursues a zero-greenhouse gas emissions electric system pursuant to the Climate Act. The core planning scenario of New York's 2025 State Energy Plan includes 5 to 7 gigawatts of offshore wind being added to New York's electric system by 2040.

172. Completion and operation of the New York Bight Invenergy project could have led to the avoidance of millions of metric tons of carbon dioxide emissions.

173. The New York Bight Lease cancellation will therefore impede New York's ability to fulfill its statutory and energy planning goals, thereby injuring its ability to implement its own laws. It also risks forcing New York to incur additional expenses to meet its emissions-reduction and renewable energy targets.

174. The New York Bight Lease cancellation will also have significant adverse environmental and public health consequences for New York.

175. Notably, the vast majority of electricity in New York City comes from fossil fuel-fired power plants. It is anticipated that incorporating electricity generated from offshore wind in the locations where gas turbines are now used to meet energy demand—for example, in the New York City metropolitan ozone nonattainment area—will reduce emissions and improve air quality for New Yorkers. By reducing the need for electricity generation from combustion turbines, the development of the

New York Bight Lease was anticipated to reduce emissions of fine particulate matter, nitrogen oxides, volatile organic compounds, and other hazardous air pollutants.

176. By reducing emissions from fossil fuels, the New York Bight Invenergy project would have reduced harmful emissions and generated large health benefits.

177. The New York Bight Lease cancellation will delay reductions in greenhouse gas emissions and air quality improvements by stalling the transition from fossil fuel-based energy to energy derived from renewable sources, including offshore wind.

### B. New Jersey Is Harmed by the Lease Cancellation and Settlement Agreement

178. New Jersey relied on the anticipated generation of offshore wind energy from the New York Bight Lease in its energy resource planning, as well as in its 2024 Energy Master Plan. The goals and targets for offshore wind set forth in those plans and resource planning were part of the State's comprehensive framework to meet projected demand for electricity. New Jersey also expected that the New York Bight Lease would help the State effectuate energy resource planning that took place in earlier years, including the State's 2019 and 2024 Energy Master Plans and the 2020 Offshore Wind Strategic Plan.

179. The New York Bight Invenergy project received an award from NJBPU on January 24, 2024. The New York Bight Lease cancellation and Settlement Agreement will harm New Jersey's energy interests by depriving New Jersey of a planned source of offshore wind energy that would have constituted two-thirds of New

Jersey's statutory requirement and over 20% of New Jersey's target of 11 gigawatts of offshore wind energy.

180. At the time of NJBPU's award to the New York Bight Invenergy project, the project was one piece of New Jersey's long-term strategy to meet forecasted capacity demands on New Jersey's electric grid using clean energy. Scarcity and congestion issues on New Jersey's electric grid will worsen without energy from offshore wind, including the Invenergy Project, leading to higher electricity costs for the State and its residents.

181. The need for additional electricity supply from offshore wind is critical because the forward-looking planning studies of PJM Interconnection, LLC (PJM), the regional electric grid operator that serves New Jersey, already envision a worsening ratio of supply relative to demand—even when accounting for 11 gigawatts of offshore wind in New Jersey beginning in the early 2030s. Demand for electricity is currently outpacing supply on the regional grid as rapid load growth outpaces the addition of new generation.

182. New Jersey's plan of adding 11 gigawatts of offshore wind energy by 2040 would ease this problem by increasing available supply. Delay or loss of that generation would exacerbate the forecasted electricity supply problem.

183. The northeast portion of the PJM grid, in which New Jersey is located, also suffers from rising annual congestion costs. For example, from 2021 to 2022, congestion costs rose from $995 million to $2.5 billion. When the transmission system is congested, the most efficient source of electricity is not used, and the area with

remaining electricity demand is served by alternative, less efficient, more expensive energy sources.

184. New Jersey's planned development of offshore wind generation and transmission would ease congestion and reduce costs, ultimately passing savings on to ratepayers, including New Jersey and its residents. New Jersey's offshore wind generation would complement the west-to-east supply of electricity, while also serving as an alternative source of electricity that would increase reliability and resilience for the PJM grid.

185. In addition, because so few leases currently exist in the New York Bight, the loss of any one lease—here, the New York Bight Invenergy Lease—increases the chance that NJBPU's future offshore wind solicitations will not be as competitive, increasing the price New Jersey must pay to procure offshore wind energy.

### C. The New England States and Delaware Are Harmed by the Lease Cancellations and Settlement Agreements

186. Cancellation of all the Leases will also delay or altogether deprive the New England States and Delaware of important reliability, affordability, economic, and emission-reduction benefits.

#### *1. The Energy Interests of the New England States and Delaware*

187. The New England States and Delaware participate in regional high-voltage electric grids and wholesale markets for electricity that are administered by the non-profits Independent System Operator New England (ISO-NE) and PJM. ISO-NE and PJM are responsible for maintaining resource adequacy and planning for

electric reliability, operating the electric transmission systems, and administering the competitive wholesale markets for electricity.

188. Similar to New York and New Jersey, energy demand in the New England States and Delaware is projected to rise over the next ten years.

189. ISO-NE's most recent forecast projects the region's electricity consumption to increase by about 9% over the next decade. Demand in the region is expected to more than double by 2050.

190. In addition, New England is on its way to becoming a winter-peaking electric system, meaning electricity demand will be highest in the colder months. Winter months are already the period when the electricity supply is most constrained in New England because the region's natural gas infrastructure runs at close to maximum capacity on the coldest days.

191. PJM also estimates that demand for electricity is now growing much faster than over the past two decades and much faster than previously predicted. PJM operates to ensure there is always a "reserve"—i.e., an excess of generation capacity above anticipated demand—to ensure grid reliability. However, in May 2025 PJM warned of potential reserve margin shortages during peak operating periods based on increased demand and decreased generation. While PJM has plans in place to ensure customers are not impacted, PJM's analysis puts into stark relief the risk of electricity demand continuing to grow faster than electricity generation in the region.

192. When power plants that are already running cannot generate sufficient electricity, more expensive and more polluting generators, including oil- and gas-burning facilities, are brought online to produce electricity, resulting in more harmful emissions for local communities and higher prices for electricity ratepayers. States are themselves ratepayers; for example, the five-year average electricity consumption for Connecticut executive branch agencies between fiscal years 2019 and 2023 was over 270,000 kilowatt-hours.

193. Offshore wind generation can reduce the need for high-cost, high-emissions electricity generation in winter months. Offshore wind has its highest capacity factor—can generate the most energy—during the coldest months, when the electric generating system in New England is most strained. Accordingly, ISO-NE's 2050 Transmission Study found that the availability of a large quantity of offshore wind energy would enhance grid reliability.

194. For these reasons, several of the New England States have, like New York and New Jersey, set goals to develop offshore wind capacity. Maine, for example, enacted a goal of developing at least 3 gigawatts of installed offshore wind capacity by the end of 2040. Me. Stat. tit. 35-A, § 3404(2). Connecticut's October 2021 Integrated Resources Plan identifies offshore wind energy development as a key strategy to achieving a reliable and affordable greenhouse gas emissions-free electricity supply by 2040, which is required under state law.

195. Similarly, Massachusetts is required by statute to procure 5,600 megawatts of offshore wind energy by June 30, 2027. In addition, as further described

below, Massachusetts has a Renewable Portfolio Standard that requires an escalating amount of renewable energy to be a part of the generation mix. The Commonwealth also has statutory greenhouse gas emission-reduction targets that seek to mitigate the impacts of climate change. *See* Mass. Gen. Law ch. 21N, § 4(h); Mass. Exec. Off. of Energy & Env't Affs., Massachusetts Clean Energy and Climate Plan for 2025 and 2030 (2022) (requiring reductions of 50% below 1990 levels by 2030, reductions of 75% below 1990 levels by 2040, and net zero emissions relative to 1990 levels by 2050). The Gulf of Maine leases represent potential capacity of more than 3,800 megawatts. The Lease cancellations thus impede the path for the Commonwealth to comply with statutory wind procurement obligations, its Renewable Portfolio Standard, and its greenhouse gas emission-reduction targets.

196. Wind energy facilities built on the Gulf of Maine Lease areas were anticipated to interconnect into New England's grid, helping the New England States to meet their wind development goals and providing the region with much-needed electricity to meet electricity demand and enhance grid reliability.

197. Facilities developed on the New York Bight Lease could also help the New England States and Delaware meet electricity demand and enhance grid reliability.

198. ISO-NE regularly imports electricity from New York to serve the region's growing demand. From January through July 2026, New England imported 4,903 gigawatt-hours of electricity from New York. Factoring in exports from New England to New York, New England relied on New York imports to serve about 6%

of its energy load in the first seven months of 2026. In 2025, New England imported 6,527 gigawatt-hours of electricity from New York.

199. PJM, which administers the electric grid in Delaware, also regularly imports electricity from New York to meet growing power demand in the region.

200. Thus, increasing the supply of offshore wind in New York could help ensure that ISO-NE and PJM are able to import sufficient capacity from New York to maintain winter reliability and affordability. Conversely, limiting the supply of offshore wind by unlawfully cancelling offshore wind leases could negatively impact reliability in these regions.

201. In addition, cancellation of the Leases could significantly harm New England's ratepayers.

202. ISO-NE wholesale electricity prices largely track the price of natural gas, which can be high and volatile in the winter months and can shift drastically in response to global market changes. A 2018 assessment by ISO-NE found that if a hypothetical 800-megawatt offshore wind project was online during the region's 16-day cold spell in December of 2017 and January of 2018, the project would have saved the region $40 million to $45 million. Indeed, ISO-NE estimated that without offshore wind, energy costs in the New England region could increase by approximately 50% by 2050.

203. Furthermore, lease area OCS-A 0567 is relatively close to load centers like Boston, where electricity demand is the highest in New England and is expected to grow significantly in coming decades. This proximity reduces the amount of

transmission infrastructure that is needed to move the power from the generation site to consumers, which reduces costs for consumers and helps minimize environmental impacts from siting transmission infrastructure.

*2. The Economic Interests of the New England States and Delaware*

204. The Settlement Agreements and Lease cancellations will also impose economic harms on the New England States and Delaware.

205. For example, Massachusetts's significant economic investments will be undermined if lease areas are canceled. The Commonwealth has invested or committed hundreds of millions of dollars to the offshore wind industry—investments that will critically support the development of offshore wind in the Gulf of Maine—including over $347,600,000 in port-related infrastructure. Massachusetts's substantial investments will be undermined if lease areas are canceled.

206. Massachusetts has also spent tens of millions of dollars investing in developing the offshore wind workforce, the offshore wind supply chain, and offshore wind research and development.

207. Without the Gulf of Maine lease areas, there will be fewer offshore wind projects available to utilize the Commonwealth's investments and enable it to make a return on its investment.

208. Additionally, the New England States will lose out on the economic benefits they were promised under the terms of the Gulf of Maine Lease agreements. The Gulf of Maine Lease agreements contained binding commitments by Invenergy to invest over $1.3 million in workforce training and domestic supply chain development and an additional $1.3 million in fisheries compensatory mitigation.

209. The Lease cancellations will also increase energy prices for the New England States and Delaware.

210. BOEM established a finite number of offshore wind energy lease areas on the Atlantic Coast. Numerous East Coast States are interested in the development of offshore wind generation to meet energy reliability and emissions goals.

211. Cancelling leases, including the Invenergy Leases, will increase competition between interested States for access to a now-reduced supply of energy produced by offshore wind facilities on the remaining lease areas. The resulting competition is likely to increase the cost of offshore wind energy for all States. This problem is magnified by President Trump's issuance of the Wind Memo in January 2025, which made all unleased areas of the Outer Continental Shelf unavailable for future wind energy leasing.

212. The Lease cancellations and Settlement Agreements could also increase the costs associated with implementing state renewable energy programs. Renewable energy generated in New York, New Jersey, the New England States, and Delaware creates environmental attributes that are traded in regional marketplaces through RECs.

213. In Massachusetts, electric distribution companies purchase RECs to comply with the Commonwealth's Renewable Portfolio Standard, which, as described above, requires obtaining specified percentages of electricity from renewable resources. These RECs can come from in-state electricity generation, but that is not required. In 2023, the most recent year for which data exists, Massachusetts settled,

i.e., consumed, 1,739,531 Massachusetts Class I RECs from clean energy generators located in New York, of which the vast majority (nearly 1.3 million) were generated by wind resources. In 2024, the most recent year for which data exists, 25.2% of RECs settled in Rhode Island were from clean energy generators located in New York.

214. The other States also have Renewable Portfolio Standards or Renewable Energy Standards. Maine has a Renewable Portfolio Standard that requires that 80% of electricity be generated by renewable resources by the year 2030 and 100% clean energy by 2040. Delaware's Renewable Portfolio Standard requires utilities to obtain 40% of their energy from clean sources by 2035. Vermont's Renewable Energy Standard demands that utilities procure all of their power from clean sources by 2035. Connecticut's Renewable Portfolio Standard, meanwhile, has existed in some form since 1998 and also relies on the purchase of RECs.

215. Offshore wind projects in the New York Bight and Gulf of Maine would generate RECs for compliance with these various State renewable energy standards. Without access to wind leases in these areas, there will be fewer RECs available for purchase, creating tighter supply and higher prices in the regional REC marketplace. In other words, a smaller group of projects will be capable of generating RECs, increasing the market price of RECs and thus increasing costs for already burdened ratepayers.

### 3. *The Climate Goals and Public Health Interests of the New England States and Delaware*

216. The foregone greenhouse gas emission reductions resulting from the Lease cancellations will exacerbate climate change and its resulting harms to the New England States and Delaware.

217. Between March 2022 and May 2024, Maine experienced an extraordinary nine natural disasters, each severe enough to merit presidential disaster or emergency declarations. With 3,500 miles of tidal coastline, Maine has the fourth-longest coast in the continental United States, and this coastline provides a vital economic function for the State. Rising sea levels and a rapidly warming Gulf of Maine caused by climate change threaten coastal communities and the marine resources they depend on. By 2050, sea level rise is forecasted to cause more than $2.1 billion in lost gross domestic product and the elimination of thousands of jobs in tourism, fishing, and real estate. In addition, as the most heavily forested state in the country, Maine is susceptible to long and frequent power outages caused by severe storms, floods, and other natural disasters. These challenges are heightened by the increased risk of severe and unpredictable weather as a result of climate change.

218. With 1,500 miles of coastline and 5.2 million people—73% of the Massachusetts population—residing in coastal communities, Massachusetts is similarly vulnerable to sea level rise and increasingly frequent extreme weather events attributable to climate change. Over the twenty-first century, Massachusetts is projected to experience approximately 4.0 to 7.6 feet of sea level rise, and estimates of coastal property damage for the Commonwealth are expected to reach over $1

billion per year by the 2070s. Flooding due to climate change will harm the approximately 177 Commonwealth-owned parks, beaches, reservations, wildlife refuges, roads, parkways, piers, and dams and necessitate increasing expenditures to protect, repair, and rebuild the Commonwealth's properties. These expenditures are expected to increase to about $17 million annually in the 2030s.

219. Connecticut also feels the effects of climate change, including through flooding, extreme storms, property loss, and negative public health consequences.

220. The same can be said of Rhode Island, which is experiencing rising average temperatures and sea levels, rising precipitation rates, and rising coastal flooding events. The State's predisposition to flooding means that Rhode Island is also disproportionately impacted by rising sea levels. The average sea level in Newport has risen by about 0.12 inches each year since 1930—an increase of nearly one foot in a century. Climate change also threatens Rhode Island's coastal resources and ecosystems. The State's rivers, bays, and ocean waters will continue to warm, threatening vulnerable species and vital industries. Moreover, increased frequency of extreme heat events due to climate change will create public health risks and strain Rhode Island's healthcare resources.

221. To combat these climate harms, the New England States and Delaware have all enacted greenhouse gas-reduction goals.

222. As described in ¶¶ 83–85 above, Maine and Massachusetts have enacted ambitious greenhouse gas emission-reduction requirements. Connecticut also has a statutory goal of reducing greenhouse gas emissions to 45% below 2001 levels by 2030

and to 65% below 2001 levels by 2040; it aims to achieve economy-wide net-zero greenhouse gas emissions by 2050. Conn. Gen. Stat. § 22a-200a(a). Rhode Island has committed to reduce greenhouse gas emissions to 45% below 1990 levels by 2030 and to achieve net-zero greenhouse gas emissions by 2050. 42 R.I. Gen. Laws § 42-6.2-9. Vermont must reduce greenhouse gas emissions by 40% below 1990 levels by 2030 and 80% below 1990 levels by 2050. Vt. Stat. Ann. tit. 10, § 578(a). And Delaware has a statutory goal of reducing greenhouse gas emissions to 50% below 2005 levels by 2030 and achieving net-zero greenhouse gas emissions by 2050. Del. Code Ann. tit. 7, § 10003.

223. Offshore wind projects are expected to significantly benefit public health by reducing other harmful pollution from fossil fuel-based power generation that the Lease areas' energy would displace. That dynamic is supported by an analysis from Synapse Economic Analysis that projects there will be substantial health benefits to adding offshore wind to the New England grid, totaling $362 million every year due to reduced criteria pollutants such as nitrogen oxide, sulfur dioxides, and particulates that result from fossil fuel combustion.

224. By preventing the development of offshore wind energy, the Settlement Agreements and Lease cancellations will lead to an increase in fossil fuel-based generation, magnifying climate change-related harms and making it more difficult for the New England States and Delaware to meet their emission-reduction goals.

## FIRST CLAIM FOR RELIEF
## (Against Interior Defendants)

### Administrative Procedure Act

### The Lease Cancellations Are Arbitrary and Capricious in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)

225. The States incorporate by reference the allegations in the preceding paragraphs.

226. Under the APA, a court is required to "hold unlawful and set aside" final agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

227. The Lease cancellations constitute final agency action. *See* 5 U.S.C. § 704. Specifically, they "mark the consummation of the agency's decisionmaking process" and are actions "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).

228. The Lease cancellations are arbitrary and capricious because Interior Defendants failed to (1) provide a reasoned explanation for cancelling the Leases; (2) explain their change in position or account for the States' reliance interests; (3) address alternative means of achieving their objectives; or (4) provide a genuine justification for the Lease cancellations.

229. *First*, an agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

230. When an agency action is based on purported concerns about national security, "APA review . . . involves more than a court rubberstamping action based

on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018).

231. The Lease cancellations are arbitrary and capricious because they lack a reasoned explanation. Interior Defendants cited "classified national security concerns" as the justification for cancelling the Leases. NY Bight Settlement Agreement at 2; Gulf of Maine 1 Settlement Agreement at 2; Gulf of Maine 2 Settlement Agreement at 2. But Interior Defendants did not specify what type of national security concerns the Leases implicated, nor did it explain why any concerns could not be adequately mitigated through BOEM's robust permitting process.

232. Interior Defendants also asserted that, if Invenergy were to continue developing the Leases, BOEM would have ordered it "to suspend construction and operations of th[e] project[s] indefinitely due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." NY Bight Settlement Agreement at 2; Gulf of Maine 1 Settlement Agreement at 2; Gulf of Maine 2 Settlement Agreement at 2. But Interior Defendants arbitrarily failed to account for the fact that courts have preliminarily enjoined or stayed all five of the referenced suspension orders as not justified by imminent national security concerns.

233. Furthermore, it is arbitrary and capricious for Interior Defendants to depart from their obligations under the Lease agreements without explanation. The terms of the Leases, as amended, provide that any cancellation "predicated on a

threat of serious irreparable, or immediate harm or damage, or an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities." NY Amended Lease § 8: Gulf of Maine 1 Amended Lease § 8; Gulf of Maine 2 Amended Lease § 8. Although Interior Defendants claim that they decided to cancel the Leases for national security purposes, they have not made any finding of "particularized harm" or determined that such harm can only be averted by completely cancelling the Leases.

234. *Second*, agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025) (citation modified).

235. Before awarding Invenergy the Leases, BOEM engaged in years of analysis, interagency consultation, and environmental review. The sale and award of the Leases were based upon and supported by an extensive record.

236. Interior Defendants failed to explain their change in position as to the purported national security concerns associated with offshore wind energy development in the New York Bight and Gulf of Maine.

237. Interior Defendants also failed to consider the significant reliance interests that the States have formed based on BOEM's award of the Leases. The APA requires an agency that is reversing a prior policy or decision "to assess whether there were reliance interests, determine whether they were significant, and weigh

any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

238. The States have relied on the development of the Lease areas as a component of their long-term strategies to support grid reliability, energy diversification, and climate goals. In cancelling the Leases, Interior Defendants did not even acknowledge these reliance interests, rendering the cancellations arbitrary and capricious for that reason as well.

239. *Third*, agencies are required to "address" alternative "way[s] of achieving [their] objectives" and give "adequate reasons" for abandoning those alternatives. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

240. BOEM offered the Lease areas for sale after significant consultation with DOD and after determining that any potential wind energy projects could sufficiently mitigate national security concerns by adopting appropriate mitigation measures.

241. Interior Defendants did not explain why the national security concerns that DOD purportedly identified required the Leases' complete cancellation and could not adequately be mitigated through site-specific measures, as previously contemplated by BOEM and DOD. Because Interior Defendants "too cavalierly sidestepped [their] responsibility to address reasonable alternatives, [their] action was not rational and must, therefore, be set aside." *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015).

242. *Fourth*, agencies are required to "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

243. The purported national security concerns that Interior Defendants described are not a genuine justification for cancelling the Lease.

244. Despite the 2005 amendments to OCSLA making the Outer Continental Shelf available for renewable energy production, including offshore wind, the Interior Secretary and President Trump have taken myriad actions to hinder wind energy development and made countless statements in public interviews and announcements opposing offshore wind energy for reasons that are unrelated to national security. These statements, and the many actions the Interior Secretary and President Trump have taken to stop the development of offshore wind energy, demonstrate that the Lease cancellations were based on political pressure and not any consideration "made relevant by Congress" in OCSLA. *See D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971).

245. The rollout of the Lease cancellations and Settlement Agreements also demonstrates pretext. In its press release announcing the deals, Interior framed both actions as an attempt to redirect capital from "costly, unreliable" wind projects toward fossil fuels.[42] While the press release vaguely references "national security concerns," it does not develop those concerns.

[42] Press Release, Interior, *supra* note 39.

246. Furthermore, while the Settlement Agreements state that, absent the Lease cancellations, BOEM would have issued suspension orders "similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025," NY Bight Settlement Agreement at 2; Gulf of Maine 1 Settlement Agreement at 2; Gulf of Maine 2 Settlement Agreement at 2, the Settlement Agreements fail to acknowledge that those suspension orders have all been preliminarily enjoined or stayed on the ground that they were not justified by any legitimate national security concerns either. *See* cases cited *supra* ¶ 120; Tr. of Prelim. Inj. Hr'g at 44:4–10, *Revolution Wind*, No. 25-cv-2999 (Jan. 12, 2026), ECF No. 65 (stating that the government's failure to explain the issuance of the suspension order "suggests that the stated national security reason may have been pretextual").

247. The Lease cancellations are, therefore, arbitrary and capricious and should be vacated and set aside under the APA.

**SECOND CLAIM FOR RELIEF**
**(Against Interior Defendants)**

**Administrative Procedure Act**

**The Lease Cancellations Are Not in Accordance with NEPA and Not in Observance of Procedure Required by NEPA in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)**

248. The States incorporate by reference the allegations in the preceding paragraphs.

249. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, among other things, "not in

accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

250. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

251. Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See id.*; *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 93, 97 (1983).

252. Agencies are also required to consider alternatives to taking a proposed action, *see* 42 U.S.C. § 4332(C)(iii), (F), (H), and to identify measures that might mitigate adverse environmental impacts and incorporate measures necessary to mitigate adverse impacts, *see Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010).

253. To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies shall, with limited exceptions, prepare an environmental assessment. *See* 42 U.S.C. § 4336(b)(2).

254. If an agency determines that the proposed action will not have any significant effect, accounting for mitigation, it can issue a finding of no significant impact. *Id.* If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. *Id.* § 4336(b)(1).

255. Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id.* § 4332(C)(iii), (F), (H).

256. Interior Defendants' cancellation of the Leases constitutes major federal action within the meaning of NEPA. *Id.* §§ 4332(C), 4336e(10).

257. Interior Defendants did not prepare an environmental assessment and finding of no significant impact, an environmental impact statement, or a record of decision regarding the Lease cancellations, nor did they otherwise conduct any NEPA review of the Lease cancellations or take a hard look at the reasonably foreseeable social, economic, and environmental impacts of the Lease cancellations and their alternatives.

258. Interior Defendants did not provide the public an opportunity to participate in a NEPA review of their decision to cancel the Leases.

259. As a result of their failure to conduct the required NEPA review, Interior Defendants failed to consider the full extent of the reasonably foreseeable impacts to the States of the Lease cancellations, including adverse impacts to grid reliability, energy diversification, and other environmental benefits that would accrue to the States if the Lease areas were developed.

260. Interior Defendants also failed to consider alternatives to cancelling the Leases, including any mitigation measures.

261. The Lease cancellations are, therefore, not in accordance with law and not in observance of procedure required by NEPA and should be vacated and set aside under the APA.

## THIRD CLAIM FOR RELIEF
## (Against Interior Defendants)

### Administrative Procedure Act and Outer Continental Shelf Lands Act

### The Lease Cancellations Are Not in Accordance with OCSLA and Not in Observance of Procedure Required by OCSLA in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(A), (D), and OCSLA, 43 U.S.C. § 1349(a)(1)

262. The States incorporate by reference the allegations in the preceding paragraphs.

263. Under the APA, a court is required to "hold unlawful and set aside" final agency action that is "not in accordance with law" and that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

264. OCSLA's citizen suit provision provides that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the [Interior] Secretary under this subchapter." 43 U.S.C. § 1349(a)(1).

265. The Lease cancellations violate OCSLA within the meaning of 43 U.S.C. § 1349(a)(1) and are not in accordance with OCSLA or the procedure required by OCSLA within the meaning of the APA because, in deciding to cancel the Leases, Interior Defendants (1) did not hold a hearing before cancelling the Leases or make

the required determination that cancellation is required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) agreed to pay Invenergy the Leases' purchase price without calculating whether that was the fair market value of the Leases at the time of cancellation, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (3) did not consider the factors they were required to consider under 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102 or otherwise demonstrate grounds for departure from regulations pursuant to 30 C.F.R. § 585.103; and (4) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

266. *First*, OCSLA specifies that a lease shall not be canceled unless the Interior Secretary determines, "after a hearing," that (i) "continued activity pursuant to such lease would probably cause serious harm or damage to life . . . to property, to any mineral . . . to the national security or defense," or "to the marine, coastal, or human environment;" (ii) "the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time;" and (iii) "the advantages of cancellation outweigh the advantages of continuing such lease." 43 U.S.C. § 1334(a)(2)(A).

267. Interior Defendants did not hold a hearing before cancelling the Leases, nor did they find that continued activity on the Leases would probably cause serious harm to national security or defense or that the purported harm would not lessen to an acceptable extent within a reasonable period.

268. *Second*, OCSLA's compensation formula provides that, in the event of a lease cancellation, a lessee shall not be paid more than the fair market value of the lease at the time of the cancellation. *Id.* § 1334(a)(2)(C). It does not permit the federal government to simply refund the initial lease payment at the original purchase price, but instead requires compensation based on a specific statutory formula. The federal government did not apply the statutory compensation formula in agreeing to reimburse Invenergy the $653,086,275 it paid for the Leases.

269. *Third*, OCSLA requires the Interior Secretary to "ensure" that any activity carried out pursuant to Interior's renewable energy leasing authority "is carried out in a manner that provides for" a set of twelve enumerated factors, which include "prevention of waste" and "fair return to the United States for any lease." *Id.* 1337(p)(4). Similarly, BOEM's regulations require BOEM to "ensure" that renewable energy activities carried out on the Outer Continental Shelf are done "in a manner that provides for and reaches a rational balance among" the twelve statutory factors, "none of which inherently outweighs or supplants any other." 30 C.F.R. § 585.102(a).

270. Interior Defendants decided to cancel the Leases without adequately considering the twelve factors they were required to "rational[ly] balance." For example, Interior Defendants did not evaluate whether the Lease cancellations, for which Interior Defendants requested $653,086,275—the full purchase price of the Leases—from the Judgment Fund, "[p]revent[ed] . . . waste, including economic waste," "protect[ed] . . . the rights of other authorized users of the [Outer Continental

Shelf]," or ensured "[a] fair return to the United States." *Id.*; *see also* 43 U.S.C. § 1337(p)(4). Interior Defendants likewise failed to establish that any departure from regulations was warranted pursuant to 30 C.F.R. § 585.103.

271. *Fourth*, OCSLA requires the Interior Secretary to "notify the Governor of any . . . State" affected by "any action" taken by a federal agency "which has a direct and significant effect on the outer Continental Shelf or its development," 43 U.S.C. § 1334(h), and to "provide for coordination and consultation with the Governor of any State . . . that may be affected by a lease" under OCSLA's offshore wind leasing provision, *id.* § 1337(p)(7).

272. The States will, as described above, be affected by the Lease cancellations. But Interior Defendants failed to coordinate or consult with any of the affected States' Governors.

273. The Lease cancellations are, therefore, not in accordance with law and not in observance of procedure required by law and should be vacated and set aside under the APA.

274. Pursuant to 43 U.S.C. § 1349(a)(2)(A), on July 16, 2026, the States provided notice to Interior Defendants of these violations of OCSLA.

275. Accordingly, in addition to granting relief under the APA, the Court should compel compliance with OCSLA by vacating the Lease cancellations pursuant to 42 U.S.C. § 1349(a)(1).

**FOURTH CLAIM FOR RELIEF**
**(Against Federal Defendants)**

**Administrative Procedure Act and Outer Continental Shelf Lands Act**

**The Settlement Agreements Are Not in Accordance with OCSLA and Are in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and OCSLA, 43 U.S.C. § 1349(a)(1)**

276. The States incorporate by reference the allegations in the preceding paragraphs.

277. Under the APA, a reviewing court must set aside a challenged agency action that is found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

278. The Settlement Agreements constitute final agency actions reviewable under the APA. *See* 5 U.S.C. § 704; *Bennett*, 520 U.S. at 177–78; *see also Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993); *United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008).

279. An agency may not "circumvent[] federal law by entering into [a] settlement agreement." *Carpenter*, 526 F.3d at 1242.

280. The Settlement Agreements are not in accordance with OCSLA and are in excess of statutory authority within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C), and constitute violations of OCSLA within the meaning of OCSLA's citizen suit provision, 43 U.S.C. § 1349(a)(1).

281. As explained in ¶¶ 262-75 above, the Lease cancellations are not in accordance with OCSLA because Interior Defendants (1) did not hold a hearing before cancelling the Leases or make the required determination that cancellation is required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) agreed to pay Invenergy the Leases' purchase price without calculating whether that was the fair market value of the Leases at the time of cancellation, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (3) did not consider the factors they were required to consider under 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102 or otherwise demonstrate grounds for departure from regulations pursuant to 30 C.F.R. § 585.103; and (4) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

282. Because the terms of the Settlement Agreements ordered the unlawful Lease cancellations, the Settlement Agreements also violate OCSLA and are not in accordance with the law within the meaning of the APA. *See Exec Bus. Media*, 3 F.3d at 762 (explaining that the Attorney General's "plenary power [to settle claims] means absolute authority to pursue legitimate objectives and does not include license to agree to settlement terms that would violate the civil laws governing the agency").

283. The Settlement Agreements are also in excess of statutory authority.

284. No act of Congress authorizes Interior or DOJ to cancel an offshore wind lease on grounds unrelated to OCSLA.

285. No act of Congress authorizes Interior or DOJ to pay the holder of an offshore wind lease the full purchase price of the lease in exchange for the lease's

cancellation. *Cf.* 43 U.S.C. § 1334(a)(2)(C) (OCSLA's compensation formula for lease cancellations).

286. The Settlement Agreements are, therefore, not in accordance with OCSLA and are in excess of statutory authority and should be vacated and set aside under the APA.

287. Pursuant to 43 U.S.C. § 1349(a)(2)(A), on July 16, 2026, the States provided notice to Federal Defendants of these violations of OCSLA.

288. Accordingly, in addition to granting relief under the APA, the Court should compel compliance with OCSLA by vacating the Settlement Agreements pursuant to 42 U.S.C. § 1349(a)(1).

**FIFTH CLAIM FOR RELIEF**
**(Against Federal Defendants)**

**Administrative Procedure Act**

**The Settlement Agreements Are Not in Accordance with the Judgment Fund Act and Are in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**

289. The States incorporate by reference the allegations in the preceding paragraphs.

290. Under the APA, a reviewing court must set aside a challenged agency action that is found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

291. An agency may not "circumvent[] federal law by entering into [a] settlement agreement." *Carpenter*, 526 F.3d at 1242.

292. The Settlement Agreements are not in accordance with the Judgment Fund Act and are in excess of statutory authority within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C).

293. The Settlement Agreements violate the Judgment Fund Act's requirement that a payment be made from the Judgment Fund only if (1) the payment is not otherwise provided for, 31 U.S.C. § 1304(a)(1), and (2) the settlement is payable under 28 U.S.C. § 2414, 31 U.S.C. § 1304(a)(3)(A).

294. *First*, leaving aside the fact that the Lease cancellations are unlawful, payment of compensation for lease cancellation is already provided for under OCSLA, 43 U.S.C. § 1334(a)(2)(C), as well as under the Lease agreements. Because OSCSLA and the Lease agreements provide for payment, the Judgment Fund may not be utilized to compensate Invenergy for the Lease cancellations.

295. *Second*, pursuant to 28 U.S.C. § 2414, compromise settlements may only be entered into for "claims referred to the Attorney General for defense of imminent litigation." Here, there was no imminent litigation nor substantive engagement by DOJ.

296. The Settlement Agreements state that BOEM would have issued suspension orders to Invenergy "due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." NY Bight Settlement Agreement at 2; Gulf of Maine 1 Settlement Agreement at 2; Gulf of Maine 2 Settlement Agreement at 2. They further state that Invenergy "could have claimed breach of contract in the event that such . . .

suspension order[s] w[ere] received and filed suit in the United States Court of Federal Claims." *Id.*

297. However, even assuming that a breach-of-contract lawsuit instead of an APA action were the proper vehicle for judicial review of a suspension order, no such lawsuit was imminent within the meaning of the Judgment Fund Act, 28 U.S.C. § 2414. To the contrary, both sides wanted to cancel the Lease.

298. Thus, the Settlement Agreements did not resolve a "legitimate dispute over either liability or amount," 3 Gov't Accountability Off., *supra* note 7, at 14-35, and did not justify the use of the Judgment Fund.

299. Moreover, a hypothetical lawsuit that "could" have been filed to challenge an agency action that had not even been threatened—here, the suspension or cancellation of the Leases—does not constitute actual or imminent litigation under the Judgment Fund Act. *See id.* at 14-34 to -35.

300. The Settlement Agreements are also in excess of statutory authority.

301. No act of Congress authorizes Federal Defendants to require the holder of offshore wind leases to agree, in exchange for receiving a payment equivalent to the full purchase price of the leases, to invest that money, or the same amount of money, in unrelated activities, essentially redirecting money from one authorized

use—offshore wind leasing—to a separate, unauthorized use favored by the President—oil and gas production.

302. The Settlement Agreements are, therefore, not in accordance with the Judgment Fund Act and are in excess of statutory authority and should be vacated and set aside under the APA.

**SIXTH CLAIM FOR RELIEF**
**(Against Federal Defendants)**

**Administrative Procedure Act**

**The Settlement Agreements Are Not in Accordance with the Antideficiency Act, Purpose Statute, or Miscellaneous Receipts Act and Are in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**

303. The States incorporate by reference the allegations in the preceding paragraphs.

304. Under the APA, a reviewing court must set aside a challenged agency action that is found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

305. The Settlement Agreements are not in accordance with the Antideficiency Act, Purpose Statute, or Miscellaneous Receipts Act and are in excess of statutory authority within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C).

306. The Settlement Agreements violate the Antideficiency Act.

307. Specifically, in adopting the Settlement Agreements, Federal Defendants authorized obligations exceeding the amount available in Interior's

appropriations in violation of the Antideficiency Act, 31 U.S.C. § 1341(a)(1)(A), and also involved the federal government in contracts for the payment of money before an appropriation was made by Congress in further violation of the Antideficiency Act, *id.* § 1341(a)(1)(B).

308. The $653,086,275 Invenergy paid for the Leases should have been deposited in the U.S. Treasury. The U.S. Congress has not appropriated $653,086,275 to Interior to compensate Invenergy for the Lease cancellations.

309. The Settlement Agreements further violate the Miscellaneous Receipts Act, which requires that "[a]n official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim" and that "[a] person having custody or possession of public money . . . shall deposit the money without delay in the Treasury." 31 U.S.C. § 3302(b)–(c).

310. Under the Miscellaneous Receipts Act, once Invenergy made its Lease payments to the federal government, Federal Defendants were obligated to deposit those payments in the Treasury and could not lawfully pay Invenergy the "reimbursement" that the Settlement Agreements purport to authorize without a further appropriation from Congress, which never occurred.[43]

311. Finally, the Settlement Agreements violate the Purpose Statute's mandate that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

---

[43] Press Release, Interior, *supra* note 39.

312. Congress did not appropriate $653,086,275 for the purpose of unlawfully cancelling offshore wind leases and redirecting that money toward oil and gas development, so the Settlement Agreements violate the Purpose Statute.

313. The Settlement Agreements are also in excess of statutory authority.

314. No act of Congress authorizes Federal Defendants to reimburse the holder of an offshore wind lease the full purchase price of the lease without congressional approval and direct the leaseholder to invest that money in unrelated activities.

315. The Settlement Agreements are, therefore, not in accordance with the Antideficiency Act, Purpose Statute, or Miscellaneous Receipts Act and are in excess of statutory authority and should be vacated and set aside under the APA.

## SEVENTH CLAIM FOR RELIEF
## (Against Federal Defendants)

### Administrative Procedure Act and U.S. Constitution

### The Settlement Agreements Are Contrary to Constitutional Authority, in Violation of the Separation of Powers Doctrine, Spending Clause, and Appropriations Clause in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)

316. The States incorporate by reference the allegations in the preceding paragraphs.

317. The APA provides that the Court "shall . . . hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

318. The Spending Clause vests exclusive authority in Congress "[t]o lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the

common Defence and general Welfare to the United States." U.S. Const. art. I, § 8, cl. 1.

319. The Appropriations Clause further provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." *Id.* art. I, § 9, cl. 7.

320. The Settlement Agreements violate the Spending and Appropriations Clauses because they illegally redirect $653,086,275 that was paid to the Treasury as part of a duly authorized offshore wind development program to fossil fuel activities for which Congress did not appropriate money, effectively usurping Congress's spending and appropriations powers.

321. By usurping Congress's spending and appropriations authorities, the Settlement Agreements violate the constitutional separation of powers doctrine.

322. Accordingly, the Settlement Agreements are contrary to constitutional authority and should be held unlawful and set aside.

**EIGHTH CLAIM FOR RELIEF**
**(Against Federal Defendants)**

***Ultra Vires* Doctrine**

**The Settlement Agreements Are *Ultra Vires***

323. The States incorporate by reference the allegations in the preceding paragraphs.

324. As explained in ¶¶ 276–322 above, no statute authorized the adoption or implementation of the Settlement Agreements.

325. The Settlement Agreements are, therefore, *ultra vires* and should be declared unlawful and vacated.

**PRAYER FOR RELIEF**

The States respectfully request that this Court enter judgment:

1. Declaring that the Lease cancellations are arbitrary and capricious, not in accordance with law, and not in observance of procedure required by law and that the Settlement Agreements are not in accordance with law, in excess of statutory authority, and *ultra vires*;

2. Compelling compliance with OCSLA;

3. Vacating the Lease cancellations and Settlement Agreements;

4. Temporarily, preliminarily, and permanently enjoining Federal Defendants from implementing the Lease cancellations and Settlement Agreements; and

5. Granting such further relief as the Court deems just and proper, including, but not limited to, attorneys' fees and costs.

Dated: New York, New York
September 22, 2026

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

/s/ *Libby Dimenstein*
Monica Wagner
*Deputy Bureau Chief*
Matthew Eisenson*
Libby Dimenstein*
*Assistant Attorneys General*
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-6351
Monica.Wagner@ag.ny.gov

FOR THE STATE OF NEW JERSEY

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ *Rachel Manning*
Jessica Palmer
*Assistant Attorney General*
Rachel Manning*
*Deputy Attorney General*
New Jersey Division of Law
25 Market Street, P.O. Box 093
Trenton, NJ 08625
(609) 376-2740
Jessica.Palmer@law.njoag.gov
Rachel.Manning@law.njoag.gov

Morgan Costello
*Deputy Bureau Chief*
Environmental Protection Bureau
The Capitol
Albany, NY 12224

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

/s/ *Matthew I. Levine*
Matthew I. Levine*
*Deputy Associate Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5250
matthew.levine@ct.gov

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

/s/ *Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Ralph K. Durstein III
Vanessa L. Kassab*
*Deputy Attorneys General*
Robin L. Jacobs
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General of Maine

/s/ *Caleb Elwell*
Caleb E. Elwell
*Assistant Attorney General*
Scott Boak
*Natural Resource Division Chief*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.Elwell@Maine.gov
Scott.Boak@Maine.gov

FOR THE COMMONWEALTH OF MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

/s/ *Turner Smith*
Turner Smith*
*Deputy Chief & Assistant Attorney General*
Nathaniel Haviland-Markowitz
*Assistant Attorney General*
Jon Whitney
*Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200

Turner.Smith@mass.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General of Rhode Island

/s/ *Emily Van Auken*
Emily Van Auken*
*Environment and Energy Unit*
*Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
evanauken@riag.ri.gov

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General of Vermont

/s/ *Hannah Yindra*
Hanna Yindra*
*Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

* *Application for pro hac vice admission pending*